Honorable Robert S. Lasnik

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

FANAYE TURNER,

          Plaintiff,

vs.

UNIVERSITY OF WASHINGTON and BUDDY RATNER,

          Defendants.

NO. CV05-1575L

DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Note on Motion Calendar:
Friday, March 16, 2007

## I. MOTION

Pursuant to Fed. R. Civ. P. 56, Defendants move for summary judgment dismissal of Plaintiff's claims for wrongful discharge in violation of public policy (Complaint ¶ 4.3), negligent or reckless infliction of emotional distress, and negligent supervision (Complaint ¶¶ 4.4-4.5).

## II. INTRODUCTION AND SUMMARY

This is an employment case brought by Fanaye Turner against the University of Washington and her former supervisor, Dr. Buddy Ratner. Ms. Turner claims that she was discriminated against on the basis of her race and national origin, and suffered retaliation because of her alleged opposition to discriminatory practices. Complaint ¶¶ 4.1-4.2. Claiming constructive discharge, she seeks to recover damages under 42 U.S.C. §§ 1981 and 1983, as well as under the Washington Law Against Discrimination, Ch. 49.60 RCW. *Id.* In

DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT- Page 1
NO: CV05-1575L

LAW OFFICES
BENNETT BIGELOW & LEEDOM, P.S.
1700 Seventh Avenue, Suite 1900
Seattle, Washington 98101
T: (206) 622-5511  F: (206) 622-8986

addition, she has alleged state common law claims for wrongful discharge in violation of public policy, and negligent and/or reckless infliction of emotional distress. *Id.* at 4.3-4.4. At this time, because the pleadings and discovery reveal that the latter set of claims are insufficient as a matter of law, Defendants ask that they be dismissed on summary judgment.

## III. EVIDENCE RELIED UPON

Defendants rely upon the Complaint, and the declarations of Michael Madden, Lorease Kendrick, and Zenaida N. Quitlong, submitted herewith.

## IV. UNDISPUTED FACTS

### A.   Background.

Plaintiff Fanaye Turner is an Ethiopian-born naturalized U.S. citizen who was hired in 1997 to serve as the Education and Outreach Director for the University of Washington Engineered Biomaterials Program ("UWEB"). Her position was not subject to civil service rules. Rather, the term of her employment was "at will." UWEB is a federally-funded National Science Foundation ("NSF") research center, the focus of which is to determine if healing and performance of implanted biomaterials might be engineered to be similar to the healing of normal wounds. Buddy Ratner, Professor of Chemical Engineering and Bio-Engineering at the University of Washington ("UW"), is the Director of UWEB and was Plaintiff's supervisor for nearly all of Ms. Turner's time at UWEB. UWEB is a part of the UW's Department of Bio-Engineering and reports to its Chair and Administrator, as well to the Deans of the College of Engineering and the School of Medicine. Declaration of Michael Madden (hereinafter, "Madden Decl."), Ex. 1 [Ratner Dep. (10/30/06), pp. 7:7-8:4; 12:20-13:8; 19:11-19:24; 27:22-28:23].

Ms. Turner's primary function was to manage the portion of UWEB's program directed at increasing participation by underrepresented groups in science and, particularly, in scientific research. Her duties involved interactions with the NSF on funding issues, with undergraduates and public school students. Madden Decl., Ex. 1 [Ratner Dep. (10/30/06),

DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT- Page 2
NO: CV05-1575L

LAW OFFICES
**BENNETT BIGELOW & LEEDOM, P.S.**
1700 Seventh Avenue, Suite 1900
Seattle, Washington 98101
T: (206) 622-5511  F: (206) 622-8986

pp. 155:19-156:18]. For the most part, her performance with regard to these external communities was deemed extremely successful. From the very beginning of her time at UWEB, however, she had significant interpersonal conflicts with administrators within UWEB and with a number of her subordinates. In some instances, these conflicts manifested in angry exchanges, and many were followed by the reassignment and/or the departure of the staff members involved. Madden Decl., Ex. 1 [Ratner Dep. (10/30/06) pp. 65:2-67:10; 105:13-109:14].

Two incidents between Ms. Turner and direct subordinates, one in April 2002 and the second in March 2003 are important to this motion. The first incident involved an African American woman named Kahreen Tebeau, who held the position of Program Coordinator reporting directly to Ms. Turner. Ms. Turner became angry about a mistake that Ms. Tebeau had made in communicating with a group of students and confronted Ms. Tebeau. After the two had shouted at one another, Ms. Tebeau claimed that, when she tried to leave the room in which they were meeting, Ms. Turner grabbed her to prevent her from leaving. Madden Decl., Ex. 1 [Ratner Dep. (10/30/06) 65:2-67:13]; Madden Decl., Ex. 2 [Turner Dep. Ex. 28, UW_TUR10028-10031 (Memorandum from Melissa Cochran to Fanaye Turner dated May 22, 2002)].

Ms. Tebeau complained to the department's administration and an investigation was conducted through the University's Human Resources department. Although Ms. Turner denied grabbing Ms. Tebeau, and there were no third party witnesses, the investigation revealed wide-spread concern among UWEB staff about Ms. Turner's behavior in the workplace. As a result, the University reprimanded Ms. Turner, directed her to take training in anger management, provided her with coaching, and warned her that further incidents could lead to dismissal. Ms. Tebeau was re-assigned and eventually left the University. *Id.* Her position was filled by temporary workers until Nina Hanlon was hired to fill the Program Coordinator position in a permanent capacity. Madden Decl., Ex. 3 [Hanlon Dep. Ex. 188,

DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT- Page 3
NO: CV05-1575L

LAW OFFICES
BENNETT BIGELOW & LEEDOM, P.S.
1700 Seventh Avenue, Suite 1900
Seattle, Washington 98101
T: (206) 622-5511  F: (206) 622-8986

1  UW_TUR672596 (Email from Fanaye Turner to Jeri Staley-Earnst dated July 11, 2002)].

2  In March, 2003, a concern arose about Ms. Hanlon's ability to timely complete certain data tables for UWEB's annual report to NSF, at the same time when Ms. Turner directed her to address other matters. This concern led to a meeting, witnessed in part by others, in which it was perceived that Ms. Turner was incessantly berating Ms. Hanlon. Dr. Andrew Branca, UWEB's Director of Industry Relations, observed Ms. Hanlon red-faced and in tears in Ms. Turner's office over a prolonged period of time. Dr. Branca's concern, and Ms. Hanlon's subsequent complaint, led to Ms. Hanlon being reassigned to work for the UWEB administrator and the commencement of another investigation by the Human Resources department. Madden Decl., Ex. 4 [Ratner Dep. Ex. 102 (Memorandum from Dr. Andrew Branca to Lorease Kendrick dated April 7, 2003)]; Madden Decl., Ex. 5 [Flores Dep. Ex. 279, UW_TUR30049-30050 (D. Flores handwritten notes regarding March 27, 2003 incident between Nina Hanlon and Fanaye Turner)]. In April 2003 a temporary worker, Tom Grames, was hired to fill the Program Coordinator position. Declaration of Zenaida N. Quitlong (hereinafter "Quitlong Decl."), ¶ 5.

The Human Resources department's investigation did not go forward quickly, because Ms. Turner responded to the Nina Hanlon incident by making allegations of race discrimination and retaliation against the UWEB administrator, Ms. Jeri Staley-Earnst, and the Department of Bio-Engineering administrator, Ms. Marguerita Jensen. Both are white. Madden Decl., Ex. 6 [Keller Dep. Ex. 208A, UW_TUR10012-10014 (UCIRO Initial Intake Sheet; Email from Dr. Yongmin Kim to Kevin Rainge dated April 4, 2003; Email from Jill Beaver Lee to Dr. Yongmin Kim dated April 18, 2003)].

Ms. Turner's charges were assigned for investigation to attorney Mike Keller of the University's Complaint Investigation and Resolution Office ("UCIRO"). Mr. Keller's investigation took from May to November, 2003. During a part of that time, Ms. Turner was on medical leave and her future employment status as well as changes to the reporting

DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT- Page 4
NO: CV05-1575L

LAW OFFICES
BENNETT BIGELOW & LEEDOM, P.S.
1700 Seventh Avenue, Suite 1900
Seattle, Washington 98101
T: (206) 622-5511  F: (206) 622-8986

structure within UWEB was in limbo pending the outcome of the UCIRO investigation. For these reasons, any action with respect to Ms. Turner's employment status was placed on hold. Madden Decl., Ex. 7 [Keller Dep. Ex. 208A, UW_TUR10019 (Letter from Mike Keller to Fanaye Turner dated May 28, 2003]; Declaration of Lorease Kendrick (hereinafter, "Kendrick Decl."), ¶ 2.

### B.  Facts Relevant to Public Policy Claim.

Dr. Ratner had determined, however, that he could not allow Ms. Turner to directly supervise staff. Therefore, he placed the Program Coordinator position, filled by Mr. Grames, under Ms. Staley-Earnst's supervision. Madden Decl., Ex. 1 [Ratner Dep. (10/30/06), pp. 177:3-179:8)]; Madden Decl., Ex. 8 [Jensen Dep. Ex. 154, UW_TUR20407 (Email from Rita Jensen to Lorease Kendrick dated April 3, 2003)]. Pending resolution of issues around Ms. Turner's status, the program coordinator position was not "posted" for permanent hiring while the UCIRO investigation continued.

In late December, 2003, Mr. Keller issued a report in which he explained his finding that Ms. Turner's charges of race discrimination and retaliation were unfounded. Madden Decl., Ex. 9 [UW_TUR30102-30113 (UCIRO Report of Investigation dated December 22, 2003)]. In early January, 2004, the UWEB administrator (Jeri Staley-Earnst) became aware that Mr. Grames was approaching the 1050 hour annual limit that civil service rules places on temporary employment. Mr. Grames was interested in permanent employment and Ms. Turner wanted to hire him. Dr. Ratner was inclined to go along with Ms. Turner, until Ms. Staley-Earnst informed him of a number of concerns that she had about Mr. Grames' behavior and relationships with others in UWEB. Madden Decl. Ex. 10 [Staley Dep. Ex. 443, UW_TUR681133 (Email from Jeri Staley-Earnst to Buddy Ratner dated January 13, 2004)]. After being informed of these concerns, Dr. Ratner agreed with Ms. Staley-Earnst's decision that Mr. Grames was not an appropriate candidate for permanent employment. Madden Decl. Ex. 1 [Ratner Dep. pp. 192:19-200:3].

DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT- Page 5
NO: CV05-1575L

LAW OFFICES
BENNETT BIGELOW & LEEDOM, P.S.
1700 Seventh Avenue, Suite 1900
Seattle, Washington 98101
T: (206) 622-5511  F: (206) 622-8986

On January 11, 2004, Ms. Turner sent an email to Dr. Ratner arguing that the position should be posted for permanent hiring. Madden Decl., Ex. 11 [Jensen Dep. Ex. 174, FT-1363 (Email from Fanaye Turner to Buddy Ratner dated January 11, 2004)]. On January 23, 2004, Ms. Turner again emailed Dr. Ratner, arguing that Mr. Grames should be hired to fill the position, and that it was a violation of UW rules and public policy not to do so. Madden Decl., Ex. 12 [Ratner Dep. Ex. 109 (Email from Fanaye Turner to Buddy Ratner, et al. dated January 23, 2004)]. Ms. Turner's requests did not change Dr. Ratner's decision not to hire Grames on a permanent basis, however, and he was let go on January 23, 2004, as previously planned. Madden Decl., Ex. 1 [Ratner Dep. pp. 192:19-200:3]; Quitlong Decl. ¶ 6, Ex. 1.

## V. ARGUMENT

### A. Plaintiff Cannot Establish The Tort of Wrongful Discharge.

Plaintiff claims that she was constructively discharged because she "repeatedly requested" that a person assisting her in a temporary capacity (Tom Grames) be allowed to fill that position as a permanent civil service employee and because she "shared her concern" that the University "violated public policy" by not hiring Grames permanently. She contends the use of a temporary worker, and the failure to "post" that position for hiring of a permanent worker violated unspecified civil service rules. Complaint ¶¶ 3.27.1-3.27.4. She also claims that "defendants wrongfully discharged her ... because of her reasonable, internal opposition to their practice of maintaining permanent, temporary employees...." *Id.* at ¶ 4.3.

Under Washington law, a claim of wrongful discharge in violation of public policy is an intentional tort: "the plaintiff must establish wrongful intent to discharge in violation of public policy." *Havens v. C & D Plastics, Inc.*, 124 Wash.2d 158, 177, 876 P.2d 435 (1994); *Cagle v. Burns & Roe, Inc.*, 106 Wash.2d 911, 726 P.2d 434 (1986). In order to make out a prima facie case, Plaintiff must establish: (1) the existence of a clear public policy (the clarity element); (2) that discouraging the conduct in which a plaintiff engaged would jeopardize the public policy (the jeopardy element); (3) that the public policy-linked conduct caused the

DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT- Page 6
NO: CV05-1575L

LAW OFFICES
BENNETT BIGELOW & LEEDOM, P.S.
1700 Seventh Avenue, Suite 1900
Seattle, Washington 98101
T: (206) 622-5511  F: (206) 622-8986

1  dismissal (the causation element); and (4) that no overriding justification for the dismissal existed (the absence of justification element). *Korslund v. Dyncorp Tri-Cities Services, Inc.*, 156 Wash.2d 168, 178, 125 P.3d 119 (2005).

Plaintiff must make an additional showing in order to establish that she was constructively discharged. Generally, a constructive discharge occurs "where an employer deliberately makes an employee's working conditions intolerable and thereby forces him to quit his job." *Bulaich v. AT & T Information Systems*, 113 Wash.2d 254, 261, 778 P.2d 1031 (1989) (internal citations and quotations omitted, emphasis in original). Although Washington law recognizes that "[d]eliberately creating conditions so intolerable as to make the employee so ill that he or she must leave work permanently is functionally the same as forcing the employee to quit," *Korslund*, 156 Wash.2d at 180, a constructive discharge does not occur "where the employee continues to receive employment benefits and is still considered to be an active employee, or where his or her ability to return to work is protected in some other way, that employee has not been constructively discharged." *Id.*

### 1.    Plaintiff Has Failed to Identify a Clear Mandate of Public Policy That Prohibited The Challenged Practice.

Plaintiff has the burden of identifying and proving the existence of a clear mandate of public policy. *Dicomes v. State*, 113 Wash.2d. 612, 617, 782 P.2d 1002 (1989). To meet this burden, "the asserted policy must be truly public. Furthermore, the asserted public policy must be clear." *Sedlacek v. Hillis*, 145 Wash.2d 379, 389, 36 P.3d 1014 (2001). Whether a particular measure qualifies as a clear mandate of public policy is a legal question. *Gardner v. Loomis Armored, Inc.*, 128 Wash.2d 931, 937, 913 P.2d 377 (1996). Courts "should not create public policy but instead only recognize clearly existing public policy under Washington law." *Sedlacek*, 145 Wash.2d at 390. Therefore, Washington courts narrowly construe the mandates of public policy "in order to guard against frivolous lawsuits." *Gardner*, 128 Wash.2d at 936.

DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT- Page 7
NO: CV05-1575L

LAW OFFICES
**BENNETT BIGELOW & LEEDOM, P.S.**
1700 Seventh Avenue, Suite 1900
Seattle, Washington 98101
T: (206) 622-5511  F: (206) 622-8986

In her pre-litigation communications with the University, as well in her Complaint, Plaintiff failed to identify any statutory or regulatory provisions that allegedly were violated by the University's failure to provide Tom Grames with an opportunity to be permanently hired. In an email sent to Dr. Ratner and others on January 23, 2004 (Grames' last day of employment), Ms. Turner simply wrote: "This is a permanent position that should not be filled by a temporary, and not posting the job, [sic] violates UW and public policy." Madden Decl., Ex. 12 [Ratner Dep. Ex. 109 (Email from Fanaye Turner to Buddy Ratner, et al. dated January 23, 2004)]. Similarly, in her Complaint, Plaintiff makes the conclusory allegation that she was discharged because of her opposition to an alleged practice of "maintaining permanent, temporary employees, that was in violation of clear mandates of Washington State law and public policy and that placed such policy in jeopardy." Complaint ¶ 4.3.

Plaintiff's failure to identify a particular statute or regulation with specificity is telling, particularly considering subsequent clarifications of state rules governing temporary employment. As discussed in detail below, in 2003-2004, Washington had a single set of rules applicable to state government's use of temporary workers to fill civil service positions. In relevant part, those rules allowed temporary appointments for no more than 1050 hours in a 12 month period. In July 2005, new rules came into effect that created separate standards for "general government" and higher education. While retaining the unqualified 1050/12 month standard for higher education, the Department of Personnel adopted a narrower set of standards for general government: WAC 357-19-360 provides:

> A general government employer may fill a position with a nonpermanent appointment when any of the following conditions exist:
> (1)  A permanent employee is absent from the position;
> (2)  The agency is recruiting to fill a vacant position with a permanent appointment;
> (3)  The agency needs to address a short-term immediate workload peak or other short-term needs;
> (4)  The agency is not filling a position with a permanent appointment due to the impending or actual layoff of a permanent employee(s); or
> (5)  The nature of the work is sporadic and does not fit a particular pattern.

DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT- Page 8
NO: CV05-1575L

LAW OFFICES
BENNETT BIGELOW & LEEDOM, P.S.
1700 Seventh Avenue, Suite 1900
Seattle, Washington 98101
T: (206) 622-5511 F: (206) 622-8986

In contrast, the current rules for higher education (WAC 357-19-435) impose no similar conditions:

> A higher education employer may make a temporary appointment for the following reasons:
> (1) The number of hours to be worked by the individual will not exceed one thousand fifty hours in any twelve consecutive month period from the original date of hire or October 1, 1989, whichever is later, in accordance with WAC 357-04-045; or
> (2) The employing official formally assigns a classified employee the duties and responsibilities of a higher-level class for a period of less than six consecutive months.

These amendments indicate, if anything, that there was a lack of clarity in former rules, which precludes Plaintiff from establishing the clarity element of her prima facie case. Alternatively, the juxtaposition of these two standards indicates, as shown below, that the University was proceeding exactly in accordance the then-existing (and current) rules for higher education.

### 2. Plaintiff Cannot Establish The Jeopardy Element.

The Washington Supreme Court had separated the issue of whether a clear mandate of public policy exists from the question of whether such a policy has been violated, and now considers the latter a part of the "jeopardy" element. *Hubbard v. Spokane County*, 146 Wash.2d 699, 708-709 n.16, 50 P.3d 602 (2002). Even after this division, however, plaintiffs must show that the acts complained of were "in fact in violation" of the alleged clear mandate of public policy. *Id.* at 714. As stated in *Sedlacek*, 145 Wash.2d at 392-393, "where there is no violation or potential violation of an enforceable law, as is the case here, a plaintiff cannot rely on the state's interest in ensuring that its citizens comply with the law." As explained below, the civil services rules applicable at the time did not clearly prohibit the University from employing Mr. Grames in a temporary capacity.

To establish jeopardy, a plaintiff must additionally "show that he or she engaged in particular conduct, and the conduct directly relates to the public policy, or was necessary for the effective enforcement of the public policy." *Korslund*, 156 Wash.2d at 181-182 (internal

DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT- Page 9
NO: CV05-1575L

LAW OFFICES
BENNETT BIGELOW & LEEDOM, P.S.
1700 Seventh Avenue, Suite 1900
Seattle, Washington 98101
T: (206) 622-5511  F: (206) 622-8986

quotations and citations omitted). In this regard, the court looks to determine whether "the employee sought to further the public good, and not merely private or proprietary interests, in reporting the alleged wrongdoing." *Dicomes*, 113 Wash.2d at 620 (1989). Here, Plaintiff has testified that she was motivated by the desire to secure a permanent assistant, not some higher desire to vindicate the policies of the state civil service law.

Finally, the plaintiff has to show that discouraging the conduct that he or she engaged in would jeopardize the public policy and that other means of promoting the public policy are inadequate. *Korslund*, 156 Wash.2d at 181-82. Here, state civil services rules provided an adequate mechanism for addressing any alleged violations regarding the use of temporary workers.

### a. Civil Service Rules Permitted Temporary Appointments For Less Than 1050 Hours in 12 Months.

Regulations promulgated by the Washington State Department of Personnel pursuant to ch. 41.06 RCW govern the employment of temporary workers by most state agencies, including the University. The events in question involving Mr. Grames occurred between June 2003 and January 2004. At that time, the relevant rules were found in Title 251 of the Washington Administrative Code ("WAC").[1]  Specifically, former WAC 251-19-120(1) provided: "[t]emporary appointment may be made only to meet employment conditions set forth in the definition of 'temporary appointment' in WAC 251-01-415." *See* http://www1.leg.wa.gov/documents/wsr/2002/07/02-07-051.htm (visited 1/09/07). In turn, former WAC 251-01-415 defined three categories of permissible "temporary appointments:"

> (1) Work performed in the absence of an employee on leave for more than six consecutive months in accordance with WAC 251-19-120(2); or
> (2) **Performance of work which does not exceed one thousand fifty hours in any twelve consecutive month period from the original date of hire** or October 1, 1989, whichever is later, in accordance with WAC 251-04-040(6)[2]; or

---

[1] Ch. 251-19 WAC was repealed effective July 1, 2005, and replaced by new rules found at Ch. 357-19 WAC. *See* Wash. St. Reg. 05-12-067.

DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT- Page 10
NO: CV05-1575L

LAW OFFICES
BENNETT BIGELOW & LEEDOM, P.S.
1700 Seventh Avenue, Suite 1900
Seattle, Washington 98101
T: (206) 622-5511 F: (206) 622-8986

(3) Formal assignment of the duties and responsibilities of a higher level class for a period of less than six consecutive months.

See http://www1.leg.wa.gov/documents/wsr/2001/11/01-11-112.htm (emphasis added).

The Washington State Personnel Appeals Board summarized the effect of these provisions as follows:

> WAC 251-04-040(6) provides that a person employed to work 1050 hours or less is exempted from coverage under the provisions of Chapter 251 WAC. As such, temporary employees working less than 1050 hours are not entitled to the benefits or protection of the higher education personnel rules. **Individuals employed to work fewer than 1050 hours are temporary employees that are not entitled to receive sick or annual leave, paid holidays, health insurance, retirement credit or the benefit of continuing employment.**

*Johnson v. Columbia Basin Comm. Coll.*, WA. Personnel Appeals Bd. No. RIF 00-0012 (2001) available at https://fortress.wa.gov/dop/prb/docs/2002%20archive/rif-00-0012.pdf (visited 1/09/07).

### b. Grames' Appointment Comported With These Rules.

Even under Plaintiff's version of the facts, it is clear that there was no violation of civil services with respect to the employment of Tom Grames. Mr. Grames was assigned to fill the position of UWEB Education and Outreach Program Coordinator on April 23, 2003, after the permanent employee in that position (Nina Hanlon) quit after complaining about abuse by Ms. Turner. Madden Decl., Ex. 14 [Turner Dep. pp. 145:18-145:20]; Quitlong Decl., ¶5. In fact, Ms. Turner herself insisted that a "temp" be immediately hired. Madden

---

[2] Former WAC 251-04-040 (6), later re-numbered as WAC 251-040-35, provided in pertinent part:

The provisions of this chapter do not apply to positions listed in RCW 41.06.070 and to the following:

\*\*\*

(d) Persons employed to work one thousand fifty hours or less in any twelve consecutive month period from the original date of hire or October 1, 1989, whichever is later. Such an appointment may be subject to remedial action in accordance with WAC 251-12-600, if the number of hours worked exceeds one thousand fifty hours in any twelve consecutive month period from the original date of hire or October 1, 1989, whichever is later, exclusive of overtime or work time as described in subsection (2)(a) of this section.

See http://www1.leg.wa.gov/documents/wsr/2003/22/03-22-003.htm

DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT- Page 11
NO: CV05-1575L

LAW OFFICES
BENNETT BIGELOW & LEEDOM, P.S.
1700 Seventh Avenue, Suite 1900
Seattle, Washington 98101
T: (206) 622-5511 F: (206) 622-8986

Decl., Ex. 1 [Ratner Dep. pp. 190:7-190:12]; Madden Decl., Ex. 13 [UW_TUR669553 (Email from Fanaye Turner to Jeri Staley-Earnst dated April 7, 2003)]. Due to the history of problems between Plaintiff and staff, Mr. Grames was assigned to report to the UWEB administrator, Jeri Staley-Earnst, but his duties involved assisting Ms. Turner. Ms. Turner claims that Dr. Ratner thereafter told her that the position would not be permanently filled until the investigation of Ms. Turner's UCIRO complaint was completed. Madden Decl., Ex. 14 [Turner Dep. (10/27/06), pp. 221:6-221:11; 222:19-222:23. Ms. Turner further claims that Mr. Grames was not offered a permanent position as a further action of retaliation and discrimination against her by Ms. Staley-Earnst. Madden Decl., Ex. 14 [Turner Dep., pp. 187:21-189:8].[3] Ms. Staley-Earnst told UTemps that Mr. Grames' assignment would end on January 23, 2004 and he was in fact terminated on that date. He had not exceeded the 1050 hour threshold at that point. Quitlong Decl., ¶ 6, Ex. 1.

Thus, this is a case like *Dicomes,* where the plaintiff was simply wrong about her assertion that a clear mandate of public policy was being violated. *See,* 113 Wash.2d at 622-623 (plaintiff failed to make out violation of clear public policy based on claim that defendants had violated statutory duty).

      c.    **Plaintiff Did Not Act For The Purpose of Furthering The Public Interest.**

Plaintiff claims to have asserted that the University was obligated to post the Program Coordinator position for permanent hire and thereby to give Mr. Grames the opportunity for permanent employment. She did so, however, for the purpose of improving her own working conditions ("Having him as a permanent employee would have been very helpful to my job.") and only coincidentally to further Mr. Grames' interest in obtaining a civil service position. Madden Decl., Ex. 14 [Turner Dep., p. 221].

---

[3] Defendants do not admit these claims, but simply point out that for purposes of summary judgment they are not sufficient to create a genuine issue of material fact for trial.

DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT- Page 12
NO: CV05-1575L

LAW OFFICES
BENNETT BIGELOW & LEEDOM, P.S.
1700 Seventh Avenue, Suite 1900
Seattle, Washington 98101
T: (206) 622-5511  F: (206) 622-8986

These circumstances are also similar to those presented in *Dicomes v. State*, where the executive secretary of the state Medical Disciplinary Board claimed she was fired for blowing the whistle on the failure of her superior to seek a legislative appropriation of all funds available for medical discipline. The court held that the plaintiff had not shown that failure to seek an appropriation "substantially and specifically endanger[ed]" the public policy in favor of effective medical discipline. 113 Wash.2d at 623. Plaintiff here has also failed to show how the University's handling of Grames' employment substantially and specifically endangered the rights of University employees. Rather, it appeared that, like the plaintiff here, *Dicomes* had acted out of self-interest, hoping to additional resources for her program. *Cf. Connick v. Myers*, 461 U.S. 138, 147, 103 S.Ct. 1684 (1983) (First Amendment protections do not attach when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest).

        d.    **Other Adequate Means of Protecting The Alleged Public Policy Exist.**

As noted, the jeopardy element also requires inquiry into the adequacy of other means of promoting the public policy in question. *Korslund*, 156 Wash.2d at 181-182. Where the adequacy inquiry involves examination of existing laws to determine their adequacy, the issue is a question of law. *Id.* Thus, for example, *Korslund* holds that an administrative process for adjudicating whistleblower complaints under the federal Energy Reorganization Act (42 U.S.C. § 5851) was "adequate" to protect the public policy interest in protecting the health and safety of public and prevent fraud and waste in the nuclear industry. 156 Wash.2d at 181-183.

Here, the rules in place at the time provided a remedy by way of administrative petition to the Director of Personnel for temporary workers believing that they should have attained permanent status.[4] The Director was authorized thereunder to provide full relief to

---

[4] Former WAC 251-12-600 provided:

DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT- Page 13
NO: CV05-1575L

LAW OFFICES
BENNETT BIGELOW & LEEDOM, P.S.
1700 Seventh Avenue, Suite 1900
Seattle, Washington 98101
T: (206) 622-5511  F: (206) 622-8986

the aggrieved worker, and to order "other actions the director may require to meet the highest personnel standards." While these provisions did not apply to plaintiff, the Washington Supreme has said in *Hubbard* that "other means of promoting the public policy need not be available to a particular individual so long as the other means are adequate to safeguard the public policy." *Hubbard*, 146 Wash.2d at 717 (citation omitted).

There is no reason why this remedy should not be deemed adequate to vindicate any public interest in enforcing the civil service laws. Surely, there is no individual more motivated and capable of doing so than the employee whose interests are directly affected by any alleged violations. Of course, in this case there was no violation of civil service rules and, undoubtedly as a result, Mr. Grames did not petition the Director. It would be an abuse of those rules to allow a self-interested bystander to seek damages on her own behalf in these circumstances. *See Sedlacek v. Hillis*, 145 Wash.2d at 393 (Despite legislature's prohibition

---

(1)   The director may take remedial action when it is determined that the following conditions exist.

    (a)   The hiring institution has made an appointment that does not comply with higher education personnel rules.

    (b)   The employee has worked in one or more positions for more than one thousand fifty hours in any twelve consecutive month period since the original hire date or October 1, 1989, whichever is later. (These hours do not include overtime or work time as described in WAC 251-04-040(3)).

    (c)   The position or positions are subject to civil service.

    (d)   The employee has not taken part in any willful failure to comply with these rules.

(2)   Remedial action includes the power to confer permanent status, set salary, establish seniority, and determine benefits accrued from the seniority date. Remedial action also includes other actions the director may require to meet the highest personnel standards.

\*\*\*

(4)   The director's order for remedial action shall be final and binding unless exceptions are filed with the personnel appeals board within thirty calendar days of the date of service of the order. Exceptions must state the specific items of the order to which exception is taken. The personnel appeals board will review the exceptions and may hold a hearing prior to modifying or affirming the director's order.

*See* http://www1.leg.wa.gov/documents/wsr/2001/11/01-11-112.htm.

DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT- Page 14
NO: CV05-1575L

LAW OFFICES
BENNETT BIGELOW & LEEDOM, P.S.
1700 Seventh Avenue, Suite 1900
Seattle, Washington 98101
T: (206) 622-5511  F: (206) 622-8986

of disability discrimination, no clear public policy mandated prohibited discrimination against those who associated with disabled person).

### 3. Plaintiff Cannot Establish The Causation Element.

There are at least three reasons why Ms. Turner cannot make out the causation element of her wrongful discharge claim. First, "[t]he tort of wrongful discharge in violation of public policy clearly applies only in a situation where an employee has been discharged." *Roberts v. Dudley*, 140 Wash.2d 58, 76, 993 P.2d 901 (2000). Ms. Turner only recorded complaint about an alleged violation of public policy occurred in January, 2004. Madden Decl., Ex. 12 [Ratner Dep. Ex. 109 (Email from Fanaye Turner to Buddy Ratner, et al. dated January 23, 2004)]. She did not stop working at the University until nearly 12 months later, when she informed the University that she would be unable to return to work for medical reasons. Madden Decl., Ex. 14 [Turner Dep., pp. 205:8-205:18]; Kendrick Decl., ¶ 5-6, Ex. 2-3. At that time, however, she remained eligible for medical leave until February 28, 2005, and could have returned to her position or another position even after February 28, 2005, provided that she was medically able to do so. Kendrick Decl., ¶ 4. Therefore, under *Korslund's* definition of constructive discharge, because "her ability to return to work [was] protected in some other way," she cannot show that her protest of the treatment of Mr. Grames led to even a "constructive discharge." Here, Plaintiff notified the University of Washington on November 24, 2004, that she was unable to return the work. Ms. Turner voluntarily ended her employment on December 31, 2004, even though her University of Washington disability leave would have continued though February 28, 2005. Kendrick Decl., ¶ 4-6.

Second, Ms. Turner herself admits that her working conditions did not change following her claim that the failure to post the position permanently violated public policy. Ms. Turner had been claiming that the Defendants were creating intolerable working conditions for her long before Mr. Grames' situation arose, and she continued to make that

DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT- Page 15
NO: CV05-1575L

LAW OFFICES
**BENNETT BIGELOW & LEEDOM, P.S.**
1700 Seventh Avenue, Suite 1900
Seattle, Washington 98101
T: (206) 622-5511  F: (206) 622-8986

claim for months thereafter. Because of there circumstances, no cause and effect relationship exists between Ms. Turner's protest of the failure to hire Grames and her alleged constructive discharge and, hence, no inference of retaliatory motive can be drawn.

Third, Ms. Turner herself has admitted that the Defendants were not motivated by a desire to punish her for championing Mr. Grames' cause. Instead, she testified that the refusal to hire Grames was part and parcel of an ongoing campaign of racial discrimination and retaliation against her for protesting racial discrimination:

> Q. Are you claiming that a reason why you were treated unfavorably is because you advocated the hiring of Mr. Grames on a permanent basis?
> A. I don't believe I was treated unfairly because I advocated for him. He was terminated because he worked very well with Education and Outreach - I enjoyed working with him, so did the other staff - and advocated for the position to be posted so he could apply for the position and continue to work in Education and Outreach.
> Q. Okay. So are you saying that they didn't hire him in order to put you at a further disadvantage?
> A. I believe so, yes.

Madden Decl., Ex. 14 (Turner Dep., pp. 187:21-188:07).

### B. Plaintiff's Negligence Claims Must be Dismissed.

Washington courts will not recognize a claim for negligent infliction of emotional distress that arises from a workplace dispute or when the only factual basis for the emotional distress is the discrimination claim. *Robel v. Roundup*, 103 Wash. App. 75, 91, 10 P.3d 1104 (2000), reversed in part, 148 Wash.2d 35, 59 P.3d 611 (2002). "[N]egligent infliction of emotional distress is a cognizable claim in the workplace when it does not arise solely from racial remarks and does not result from an employer's disciplinary acts or its response to a personality dispute." *Chea v. Men's Wearhouse, Inc.*, 85 Wash. App. 405, 407, 932 P.2d 1261, 971 P.2d 520 (1997), *review denied*, 134 Wash.2d 1002, 953 P.2d 96 (1998). Here, Plaintiff's emotional distress claim arose from the very same events that support her discrimination claim, and it is therefore duplicative. Plaintiff may not recover under this theory because, as Washington courts have explained:

DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT- Page 16
NO: CV05-1575L

LAW OFFICES
BENNETT BIGELOW & LEEDOM, P.S.
1700 Seventh Avenue, Suite 1900
Seattle, Washington 98101
T: (206) 622-5511  F: (206) 622-8986

> The utility of permitting employers to handle workplace disputes outweighs the risk of harm to employees who may exhibit symptoms of emotional distress as a result. The employers, not the courts, are in the best position to determine whether such disputes should be resolved by employee counseling, discipline, transfers, terminations or no action at all. While such actions undoubtedly are stressful to impacted employees, the courts cannot guarantee a stress-free workplace.

*Id.* at p. 90, quoting *Bishop v. State*, 77 Wash. App. 228, 234-35, 889 P.2d 959 (1995); *see also, Francom v. Costco Wholesale, Inc.*, 98 Wash. App. 845, 991 P.2d 1182, *review denied*, 141 Wash.2d 1017, 10 P.3d 1071 (2000) (dismissing claims for negligent infliction of emotional distress and negligent supervision where emotional distress claim arose from the same events that gave rise to discrimination claim). In this case, Plaintiff is claiming emotional distress damages as a result of the very same events that form the basis of her discrimination claim: Because these events form the core of Plaintiff's discrimination claim under which she is claiming emotional distress damages, they do not give rise to an independent claim for negligent infliction of emotional distress. Plaintiff's claim should be dismissed as a matter of law.

### C. Plaintiff's Claim For Negligent Supervision is Duplicative And Must be Dismissed.

A claim for negligent supervision fails if it duplicates Plaintiff's claim for emotional distress damages under a discrimination theory. *See, Francom v Costco Wholesale, Inc.*, 98 Wash. App. 845, 991 P.2d 1182, review denied, 141 Wash.2d 1017 (2000). Even if Plaintiff's negligent supervision claim weren't duplicative, Plaintiff cannot establish a prima facie case of negligent supervision. To do so, she must prove that 1) another employee acted outside the scope of his employment; 2) the employee presented a risk of harm to her; 3) her employer knew or should have known that the employee posed such a risk; and 4) the employer's failure to supervise the offending employee was the proximate cause of her injury. *Francom v. Costco. Wholesale Corp.*, 98 Wash. App. at 865-66. Plaintiff can produce no evidence that

DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT- Page 17
NO: CV05-1575L

LAW OFFICES
**BENNETT BIGELOW & LEEDOM, P.S.**
1700 Seventh Avenue, Suite 1900
Seattle, Washington 98101
T: (206) 622-5511  F: (206) 622-8986

any of the individuals here involved acted outside the scope of their employment to cause her emotional distress.

## VI. CONCLUSION

For these reasons, the Court should dismiss Plaintiff's claims for wrongful termination in violation of public policy, negligent infliction of emotional distress and negligent supervision.

DATED this 22 day of February 2007.

BENNETT BIGELOW & LEEDOM, P.S.

By: _____
Michael Madden WSBA #8747
Linda M. Coleman WSBA # 32355
Special Assistant Attorneys General
Attorneys for Defendants

w:\wdclient\1408\00055\mm702448.doc

DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT- Page 18
NO: CV05-1575L

LAW OFFICES
BENNETT BIGELOW & LEEDOM, P.S.
1700 Seventh Avenue, Suite 1900
Seattle, Washington 98101
T: (206) 622-5511  F: (206) 622-8986