# EXHIBIT 1
Declaration of Michael Madden

Buddy Ratner                                    October 30, 2006

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

FANAYE TURNER,              )
                           )
        Plaintiff,         )
                           )
    vs.                    )    No. CV05-1575L
                           )
UNIVERSITY OF              )
WASHINGTON and BUDDY       )
RATNER,                    )
                           )
        Defendants.        )

DEPOSITION UPON ORAL EXAMINATION OF

BUDDY RATNER

Taken at

705 Second Avenue

Suite 1500

Seattle, Washington

October 30, 2006

9:00 a.m.

Buddy Ratner                                          October 30, 2006

Page 7

1    Deposition Reporters.   Please swear in the witness and

2    we may proceed with the deposition.

3    BUDDY RATNER,                being first duly sworn,

4                                testified as follows:

5                        EXAMINATION

6    BY MS. BRENNEKE:

7    Q    Please state your name and spell it for the record.

8    A    Buddy Ratner, B-u-d-d-y, R-a-t-n-e-r.

9    Q    What is your address?

10   A    1612 Bigelow Avenue North, Seattle.

11   Q    And who is your employer?

12   A    University of Washington.

13   Q    What is your position?

14   A    Professor.

15   Q    Do you have any other positions other than professor?

16   A    Director of UWEB Center.

17   Q    What is UWEB Center?

18   A    UWEB is University of Washington Engineered

19        Biomaterials and a National Science Foundation

20        Engineering Research Center.

21   Q    What is an Engineering Research Center?

22   A    Engineering Research Center is a large program funded

23        for 10 or 11 years by the National Science Foundation

24        that is intended to impact an area of engineering in

25        an area of economic importance to the United States

Buddy Ratner                                          October 30, 2006

Page 8

1      and will require the integration of research,

2      education and industry aspects.

3    Q    What aspect of engineering does UWEB focus on?

4    A    We focus on medical devices, medical implants.

5    Q    Before we get too far into this, let me ask you, have

6         you had your deposition taken before?

7    A    Yes, I have.

8    Q    How many times?

9    A    I think five times in the past.

10   Q    Will you tell me briefly what each of those

11        depositions was related to?

12   A    Well, they all related to the medical device industry.

13   Q    Did you serve as a fact witness or an expert witness?

14   A    Expert witness, yes.

15   Q    Have you ever had a deposition taken in any

16        employment-related claim?

17   A    No.

18   Q    Let me -- and you did attend Fanaye Turner's

19        deposition on Friday of last week, correct?

20   A    That's right.

21   Q    All right.  So let me review briefly the rules of this

22        deposition, just so that we can be on the same page.

23             The most important thing is that you understand

24        what I am asking you.  If there's any ambiguity in my

25        questions, and sometimes they will come out muddled,

Buddy Ratner                                    October 30, 2006

Page 12

1   A    I think there have probably been a few over the years.

2        In most recent years there was one for -- two of them

3        that we applied for.  And let me just clarify again

4        that the application was internal within the

5        Engineering Research Center program, not to the

6        National Science Foundation directly.  And there were

7        two grants, one for a -- an REU program, which is a

8        research experience for undergraduates program with, I

9        believe it's, Prairie View A&M, and another was a

10       research program with Prairie View A&M, and those were

11       not funded.

12  Q    When was it that those grants were submitted?

13  A    I would have to guess someplace in the 2004, 2005 time

14       frame.

15  Q    Other than those grants, have there been any grants

16       that were submitted by UWEB to the National Science

17       Foundation for the education and outreach program that

18       have been denied?

19  A    I can't think of specific ones.

20  Q    You indicated you are a professor.

21            Is that a professor of -- in engineering?

22  A    Professor of bioengineering and chemical engineering.

23  Q    Okay.  What is your personal area of expertise?

24  A    It actually is quite broad.  I deal with surfaces of

25       medical devices, biomaterials, polymer chemistry,

Buddy Ratner                                    October 30, 2006

Page 13

1     surface treatments, protein absorption, blood

2     compatibility, biological reaction.  There is a whole

3     range of variations that people know my reputation in.

4   Q   As a professor, are you responsible for teaching

5       course work at the University of Washington?

6   A   I am.

7   Q   Are you a full-time professor?

8   A   That's right.

9   Q   Are you also responsible for -- or as part of your

10      professor work traveling a lot?

11  A   Yes.

12  Q   And what kind of travel do you do as part of your

13      academic work?

14  A   A variety of different travel obligations.  Talks

15      presented at scientific meetings are very common.  I

16      am involved with a number of scientific societies,

17      have been president and vice president of a number of

18      scientific societies.  I've served on the councils of

19      boards of a few such societies.  The National Science

20      Foundation itself requires that I participate in the

21      few meetings a year that they run.

22          I -- let's see.  The type of things that I do on

23      travel.  I consult with certain companies and serve on

24      a number of advisory boards for universities.  That's

25      a pretty good sampling.

Buddy Ratner                                   October 30, 2006

Page 19

1   A   She did not clarify that with me, although I asked
2       specifically.
3   Q   So Jenine --
4   A   Hunjyo.
5   Q   -- Hunjyo started in beginning of 2005?
6   A   I think 2005, maybe.
7   Q   At the beginning of 2005?
8   A   Yes.  Could be.  Again, I'd have to go back and look
9       at the precise chronology here.
10  Q   Okay.  Let's look at some documents to assist in that.
11      In addition to the administrative director having
12      responsibility for handling the administration and
13      personnel of UWEB, did you also rely upon the
14      administrative directors of bioengineering to assist
15      you in handling personnel matters at UWEB?
16  A   Yes.  Yes.  They had ultimate responsibility.  Bio --
17      UWEB administratively falls under bioengineering.
18  Q   And so when you said that it had ultimate
19      responsibility, what do you mean?
20  A   I think the major, let's see, protocols or procedures,
21      which is probably the best word, that would meet the
22      University requirements were formulated within
23      bioengineering, and we were notified this is how
24      personnel was done, et cetera.
25  Q   What was the title of the person within bioengineering

Buddy Ratner                                        October 30, 2006

Page 27

```
 1        actually provided?
 2    A   No, I am not aware.
 3    Q   And was the training related to discrimination and
 4        retaliation?
 5    A   I believe it covered a number of different aspects.
 6        It covered fiscal aspects.  It covered personnel
 7        aspects.  And I am pretty sure that these aspects
 8        would have been covered, yes.
 9    Q   You're pretty sure, but you're not entirely sure.
10    A   Not sure.
11    Q   Did you ever refer to those binders after the
12        training?
13    A   Just briefly on occasion, yes.
14    Q   Which occasions did you refer to those binders?
15    A   I think just in general review.  It wasn't associated
16        with a specific occasion.  I would look through them
17        from time to time to understand what was in them.
18    Q   So you never referred to them, to any binders or any
19        written policies regarding discrimination or
20        retaliation in handling personnel matters?
21    A   No.
22    Q   UWEB is institutionally part of the Department of
23        Bioengineering; is that correct?
24    A   That's correct.
25    Q   And bioengineering is institutionally part of the
```

Buddy Ratner                                          October 30, 2006

Page 28

1      School of Engineering and the School of Medicine; is

2      that correct?

3    A   That's correct.

4    Q   Okay.  Did you as director of UWEB have any management

5      over you, any supervisor?

6    A   Yes.

7    Q   Who was your supervisor?

8    A   My direct supervisor is my department chair, nominally

9      two different -- two department chairs, but one of

10     them defers to my primary department, so my department

11     chair in bioengineering would be the primary person in

12     principle.  I have responsibility to the Chemical

13     Engineering Department chair and the Bioengineering

14     Department chair, and directly above those two chairs

15     would be the deans of medicine and engineering.

16   Q   The department chair of bioengineering was who?

17   A   Through most of the period we're discussing here,

18     Yongmin Kim.

19   Q   Who was the dean of engineering?

20   A   Dean of engineering through most of the period was

21     Denise Denton.

22   Q   And who was the dean of medicine?

23   A   The dean of medicine was Paul Ramsey.

24   Q   Did you ever have any performance evaluations?

25   A   I meet with my chair once a year.

Buddy Ratner                                                    October 30, 2006

Page 65

1        go back to the Kahreen Tebeau incident.

2              Were you directly involved in any complaints

3        involving Kahreen Tebeau?

4    A   What do you mean by "directly involved"?

5    Q   Did you receive a complaint from Kahreen or Ms.

6        Turner?

7    A   No.  I received -- neither of them complained directly

8        to me.

9    Q   How did you find out about any incident involving

10       Kahreen Tebeau?

11   A   My administrator described the incident to me.

12   Q   What did you understand happened?

13   A   I understood that there was an incidence which in one

14       case was described as a gentle touch on the hand and

15       the other incident was described as a grabbing and

16       shaking, and two sides of two persons involved.  I

17       understand that both were angry and there was a lot of

18       shouting so that Ms. Tebeau stormed out in the hall

19       yelling something to the effect of -- expressing a

20       concern or a threat, concern of threat.  And there

21       were a number of people, witnesses that were present

22       at the time corroborated aspects of this.  But

23       precisely what happened behind the closed door was

24       something that we have two parties there, no witness.

25       Both of them had a vision of what occurred.

Buddy Ratner                                October 30, 2006

Page 66

1   Q   Were you involved in any way in determining how the
2       handling of that incident was done?

3   A   It was pretty quickly taken out of my hands, so I was
4       not involved.

5   Q   Did you make any recommendation about how that should
6       be handled?

7   A   No.

8   Q   Who took over the handling of that incident?

9   A   I would have to guess it would be Rita Jensen who was
10      probably coordinating that incident, but such
11      incidents do quickly reach HR which takes charge of
12      them.

13  Q   What was the outcome of that?

14  A   Well, quickly led to Ms. Tebeau's departure from UWEB
15      was one outcome of it.  I don't remember the precise
16      details, but she left our employ.  And I believe there
17      was some reprimand to Ms. Turner.

18  Q   Were you involved in any way in determining the
19      disciplinary action given to Ms. Turner?

20  A   No.

21  Q   Were you involved in any way in determining how to
22      handle the incident in terms of training or team
23      building?

24  A   I think some recommendations came about.  There were
25      recommendations -- now, mind you, there were so many

Buddy Ratner                                    October 30, 2006

Page 67

1    incidents around this time that precisely this one is

2    hard to say.  There were quite a few personnel

3    incidents that happened in a rather short order.  But

4    there were recommendations that Ms. Turner take

5    certain courses.  That were recommendations that she

6    meet in counseling session.  There were documents that

7    she was asked to sign that she understood appropriate

8    protocols in the workplace.  And all of these happened

9    around probably this incident, but certainly around

10   other incidents that occurred about that time.

11  Q    Were you involved in formulating any of those

12       recommendations?

13  A    No, I was not.

14  Q    Do you recall there being a team-building meeting held

15       by Dean Denton?

16  A    Yes, I recall that.

17  Q    Did you attend that meeting?

18  A    I think I was present.

19  Q    Okay.  Did you have any involvement in setting up that

20       meeting?

21  A    No, I did not.

22  Q    How did you find out about it?

23  A    I believe the dean let me know about it.

24  Q    How much in advance?

25  A    Sufficiently far in advance to get on my busy

Buddy Ratner                                October 30, 2006

Page 105

1       concern about Ms. Barnett's behavior and Ms.

2       Weightman's behavior in that meeting.

3    A  Let's say the flare-up in the office, but that seemed

4       to have overflowed to a number of things, and I'm not

5       sure which came first, the chicken or the egg again,

6       but the -- at about that time there was a lot of

7       accusations.  A lot of people came into my office.

8       We went through a tremendous number of tissues during

9       that incident, and there was a lot of anger and ill

10       will.  And Ms. Barnett was involved, came in a few

11       times.  Alma came in a few times.  Fanaye came into my

12       office a few times.

13   Q  Other than what you have already testified to, were

14       there any other complaints -- and we'll get to Cindy

15       Long because you mentioned her name.  Other than Cindy

16       Long and what you have already testified to, were

17       there any other complaints that you are aware of

18       regarding Ms. Turner's interactions in the workplace?

19   A  I think there were many complaints from staff, but the

20       precise ones, again, there was a time period where

21       there was a steady stream of complaints.

22   Q  Can you identify any of those as we sit here today?

23   A  No.

24   Q  And that steady --

25   A  Just many, many people that complained.

Buddy Ratner                                    October 30, 2006

Page 106

1   Q   To you?

2   A   To me.

3   Q   Can you tell me when that was?

4   A   I wish I could think of when it really -- sometime

5       after the Cindy Long incident.  And just a series of

6       incidents, of people angry and leaving that office.

7       And there was a budget crisis that precipitated a lot

8       of anger with the education outreach office budget.

9       There was the tension over the tables, NSF tables, and

10      those all led to a lot of back-and-forth accusations.

11      Ms. Turner was also consistently in my office

12      presenting her side to the stories.

13  Q   And the steady stream, was that after the Kahreen

14      Tebeau incident, as well?

15  A   As I said, there were at least 11 people that had, at

16      one point or another, gotten into incidents.

17  Q   At least 11.  Okay.  That's very precise.  You haven't

18      told me 11.

19  A   Yes.

20                      MR. MADDEN:  Object to the --

21  Q   (By Ms. Brenneke)  Who -- how do you know 11?

22  A   Because I made a list.

23  Q   Where is that list?

24  A   I have it on a scrap of paper.

25  Q   Where is that scrap of paper?

Buddy Ratner                                                    October 30, 2006

1    A    The scrap of paper is in a pad of paper, it's on the

2         back page on a pad of paper.

3    Q    Where do you keep that pad of paper?

4    A    I think we could reveal this.

5                   MR. MADDEN:  It's sitting here in my

6         bag.  It is a list that he made for me yesterday -- or

7         Saturday, excuse me.

8                   MS. BRENNEKE:  Okay.  Is that for

9         some response to interrogatories and request for

10        production that have been presented?

11                  MR. MADDEN:  No.  That was for me.

12                  MS. BRENNEKE:  Because we do have

13        some outstanding at this point, and I want to make

14        sure that -- okay.

15   Q    (By Ms. Brenneke)  Do you have any written records of

16        any of those complaints --

17   A    I don't, no.

18   Q    -- from those people?

19   A    No.  Or let me put it another way.  All my personnel

20        files were collected by my staff and given in the

21        discovery phase.

22   Q    All right.

23   A    So you would have anything that I would have.

24   Q    Okay.  And when you made this list of 11, can you tell

25        me, was this list -- did it include Cindy Long?

Buddy Ratner                                    October 30, 2006

Page 108

1   A   Yes.

2   Q   And it included Kahreen Tebeau?

3   A   Yes.

4   Q   And at this point you can't recall anyone else; is

5       that right?

6                   MR. MADDEN:  Object to the form of

7       the question.  You haven't asked him.

8   A   I could attempt to create the list, but it's hard to

9       do that --

10  Q   (By Ms. Brenneke)  Why don't you go ahead.

11  A   We could put Clair Hannon, Cindy Long.  We could put

12      Kahreen Tebeau.  We could put Nina Hanlon.  We could

13      put Alma Weightman, Margaret Kramer.  We could put

14      Jeri Staley-Earnst on such a list.  And there were a

15      few other names, too.

16  Q   Can you tell me the other names?  Sorry, I thought you

17      were thinking perhaps.

18  A   No, I am thinking.  Let's put *Julie Schmidt's name

19      down there.  I'm not sure if Shari was on the list.

20      Maybe she should be a 12th.  I'll have to see.

21  Q   Shari Ireton?

22  A   Ireton, yeah.  Oh, Michelle Barnett, Diane Carboni.

23      How many do I have there?

24  Q   That's 11.

25  A   Not bad.

Buddy Ratner                                        October 30, 2006

1   Q   Okay.  And you're saying all of these people came to

2       you to personally --

3   A   At one point or another that we had personnel

4       incidents, all of which involved Ms. Turner with every

5       one of these.

6   Q   And because we've already gone through Ms. Weightman

7       and the personnel incident involved a complaint Ms.

8       Turner brought against Ms. Weightman and you found

9       sustained --

10   A   Yes.

11   Q   -- I want to be precise.

12   A   I was precise in my wording.  We had personnel

13       incidents around all these people that all involved

14       Ms. Turner.

15   Q   Okay.  With regard to Clair Hannon, what is the nature

16       of the personnel incident involving Ms. Turner?

17   A   Well, the two couldn't talk to each over.  They both

18       fought and both came into my office and complained

19       about each other.

20   Q   What was Ms. Hannon's position?

21   A   She was a communication specialist.

22   Q   What was her race?

23   A   Caucasian.

24   Q   Did she raise any particular concerns about Ms.

25       Turner?

Buddy Ratner                                October 30, 2006

Page 155

1      those continuing exhibits.

2          Have you seen Exhibit-74 before?  It's a

3      cognitive job analysis.

4  A   No, I have never seen this before.

5  Q   Take a look at the second page and see if you've seen

6      that.  You're listed as the contact.

7  A   Um-hmm.

8              MR. MADDEN:  Is that a question?

9              MS. BRENNEKE:  Yeah, I want him to

10     look at the second page.  The first page isn't as

11     clearly directed to him, but the second one might be,

12     the second through -- the actual analysis goes from

13     Pages, I think, 3 through 13 on this document.  Pages

14     numbered 3 through 13.

15  Q  (By Ms. Brenneke)  Have you seen those before, now

16     that you look at those?

17  A   They really don't look familiar to me.  I don't recall

18     them.

19  Q   All right.  So Ms. Turner as the director of UWEB

20     education and outreach had what responsibilities?

21  A   Director of education outreach, it would be to fulfill

22     our mission to bring more students and more diverse

23     students into science and engineering.

24  Q   And in order to do that, she had responsibility for

25     grant writing and program development; is that

Buddy Ratner                                    October 30, 2006

Page 156

1      correct?

2    A   I think one of the responsibilities was, yes, to bring

3        in some of the funds necessary to do this.

4    Q   And she authored a number of grants that you reviewed

5        and submitted; is that correct?

6    A   She authored some of the grants, yes, or at least her

7        staff did.  Caren Tidwell, I know, authored a number

8        of the grants.

9    Q   And Ms. Turner herself authored a number of grants;

10       isn't that correct?

11   A   I think she authored some.

12   Q   Okay.

13   A   They were all planned.  Fanaye would come into my

14       office and say, We have this opportunity.

15           We would scheme about how we might best spin

16       this.   We would develop ideas, and the actual writing

17       was largely done through her office.

18   Q   Okay.

19                         (Exhibit-91 marked.)

20   Q   (By Ms. Brenneke)  Is Exhibit-91 a copy of portions of

21       UWEB's second-year report to the National Science

22       Foundation, including the education initiative

23       proposal?

24   A   The format certainly looks like it.  Now, let's see,

25       is the proposal in here?

Buddy Ratner                                            October 30, 2006

Page 176

1          that this is a performance review where I suggested

2          that she was not performing up to specifications.

3     Q    Did Ms. Turner follow up with you, asking you to

4          please finalize her evaluation in 2003 so that she

5          could get her funding increase, her salary increase

6          or --

7     A    Finalized on June 19th, 2003.

8     Q    Okay.  What I'm asking you is, did she ever follow up

9          with you and ask you to please finalize it because she

10         hadn't received a copy?

11    A    I don't remember that.

12    Q    Did you ever tell her that you would have to wait

13         until her UCIRO complaint was resolved before

14         finalizing this?

15    A    I certainly don't remember ever saying that, no.

16    Q    So are you saying you didn't say it, or are you saying

17         you just don't recall?

18    A    I don't recall.

19    Q    Did Ms. Turner indicate to you during the May meeting

20         that part of the reason things were difficult, for

21         example, the report section being late, was that she

22         was without a staff person in her education outreach

23         program for some period of time?

24    A    I'm trying to think if that was the time when I was

25         told she should not have any staff people, which I

Buddy Ratner                                          October 30, 2006

Page 177

1    implemented.  So that would explain that.  But we were
2    always -- also told her that we would get the work
3    done if she would assign it.  She just didn't have
4    managerial responsibilities for people then.

5   Q   Okay.  And you removed the staff -- her -- you removed
6       her responsibility for overseeing the education
7       outreach coordinator position; is that correct?

8   A   What we did was -- specifics were I was told by the
9       dean that we should no longer allow her to be doing --
10      to directly supervise staff.  The dean had had it
11      quite up to as far as she would accept this.  It was
12      unacceptable to her, and she gave me a directive that
13      there could be no more problems coming from UWEB.
14      She was fed up.

15  Q   Did she also indicate to you that you, Buddy Ratner,
16      needed to deal with her, things had to change?

17  A   She may have said that, but largely the discussions
18      were involved around supervision and we had too many
19      incidents in a row where people Fanaye was directly
20      supervising had blown up into unfortunate incidences,
21      and the mechanism the dean told me about was the one
22      that I implemented.

23  Q   So when was it that -- and this is Dean Denton, I take
24      it?

25  A   Dean Denton, yes.

Buddy Ratner                                    October 30, 2006

Page 178

1   Q   When was it that Dean Denton directed you to remove

2       the supervisory authority that Ms. Turner had over the

3       education and outreach coordinator?

4   A   The education outreach coordinator, are you saying

5       that correctly?

6   Q   Program coordinator.

7   A   Program coordinator.  At the point where we had

8       sufficient number of staff complaints -- and I'm not

9       sure that the dean told me to directly do that, but

10      the dean told me that there could be no more problems,

11      and we might have discussed this as a mechanism to do

12      this.  And so I implemented that.

13  Q   Okay.  So Dean Denton didn't tell you what to do, you

14      made the decision what to do; is that correct?

15  A   I think Dean Denton probably said there would be no

16      more problems in that office.

17  Q   So prior to this evaluation meeting, had you provided

18      Ms. Turner with any kind of notice that there were

19      problems with her staff and that she needed to deal

20      with things differently?

21  A   We just had quite a few incidents in a row.  I think

22      it was glaringly obvious there were problems in the

23      office, and I -- as I indicated in my document here,

24      said it, the lack of harmony and all was -- I mean,

25      this was glaringly apparent, given the magnitude of

Buddy Ratner                                           October 30, 2006

1    the blow-ups that were increasing in frequency and

2    intensity.  And so I don't think it's necessary to

3    state the super obvious, that there is a problem in

4    the office.  But the mechanism we chose to do this

5    was just put the management responsibility under

6    somebody else and let Fanaye feed the work through the

7    UWEB program administrator, which is something I can

8    do, because I have responsibility for the program.

9    Q    Do you --

10   A    We had to get the work done.

11   Q    You assigned the program coordinator for the education

12        and outreach program to the program administrator; is

13        that correct?

14   A    That's right.

15   Q    And you also decided to assign the budget

16        responsibilities to that person, as well?

17   A    That's right.

18   Q    Although there were no budget problems involving Ms.

19        Turner's group?

20   A    There were a number of budget problems before that --

21        I don't remember the exact chronology, but we had

22        quite a few budget problems.

23   Q    What were the budget problems?

24   A    Underspending, underreporting, poor bookkeeping and a

25        variety of related problems like that.

Buddy Ratner                                            October 30, 2006

1   Q   Prior to the May 2003 meeting you had with Ms. Turner

2       to go over her evaluation, had you ever raised any

3       concerns with Ms. Turner about budget problems?

4   A   There were many concerns that were raised about budget

5       problems, yes.  I don't remember, again, the exact

6       chronology, but --

7   Q   Is there anything you can recall actually bringing to

8       her attention regarding the budget prior to May 23rd,

9       2003?

10  A   I can remember sitting down in quite a few budget

11      meetings in our office with our budget

12      administrator -- in fact, I think one of the flare-ups

13      occurred right in my office over this -- and going

14      over some of the irregularities that were in the

15      budget.

16  Q   What was the irregularity?

17  A   The irregularities were the way a number of different

18      accounts were handled, the fact it was underspent and

19      not reported.  There were a number of

20      responsibilities.

21  Q   Who was in the office when you did that?

22  A   Again, it was either Michelle Barnett or Diane

23      Carboni, one of those two.

24  Q   Do you have any written records of that?

25  A   I think there were written records, yeah.  I don't

Buddy Ratner                                    October 30, 2006

Page 190

1   Q   Okay.

2   A   But I don't remember when that -- date that was.

3   Q   Isn't it true that Jeri Staley-Earnst opposed having

4       ongoing responsibilities for the supervision of Nina

5       Hanlon or the person in her position?

6   A   Yes, that is true.

7   Q   And isn't it true that Ms. Turner really wanted to

8       have a temporary hired immediately if she couldn't

9       supervise Nina directly?

10  A   I think that was made pretty clear.

11  Q   Okay.  And she sent a series of e-mails regarding

12      wanting to hire someone; is that correct?

13  A   That's right.

14  Q   And yet because you removed the authority, she didn't

15      have the authority to post it, correct?

16  A   That's right.

17  Q   So Ms. Staley-Earnst had to do that; is that correct?

18  A   I think that's right.

19  Q   Okay.  And eventually -- let's see.  And Ms.

20      Staley-Earnst made some complaints to you with regard

21      to her interactions with Fanaye Turner regarding

22      hiring a new temp; is that correct?

23  A   I think I recall an e-mail from Jeri Staley-Earnst,

24      yes.

25                  (Exhibit-105 marked.)

Buddy Ratner                                    October 30, 2006

Page 192

1   A   I don't think it's hardly a complaint.  It sounds like

2       an important warning.

3   Q   And so how is it that, if you have read Fanaye's

4       e-mail about this, meeting attempts and the fact that

5       there is incomplete work on the REUs, is there

6       anything inappropriate in that e-mail?

7                   MR. MADDEN:  Before you answer,

8       Doctor, have you completed reviewing the document?

9                   MS. BRENNEKE:  He said he had read

10      it, yeah.

11  Q   (By Ms. Brenneke)  Do you see anything wrong with what

12      Fanaye had written?

13  A   I know reading through this, my feel is that something

14      is missing here, because Jeri's warning seems overly

15      enthusiastic.  It hardly seems inflammatory and

16      libelous.  Fanaye was suggesting that Nina was having

17      some problems with it.  It doesn't seem inflammatory

18      or libelous to me.

19  Q   Were you involved in any way in the hiring of Tom

20      Grames as the assistant?

21  A   No.

22  Q   And did you understand that Ms. -- based upon your

23      direction, was Ms. Turner to assign him work through

24      Ms. Jeri Staley-Earnst?

25  A   That's right.

Buddy Ratner                                    October 30, 2006

Page 193

1   Q   Over time did she end up assigning it directly?

2   A   I think the system eroded and Tom Grames wound up

3       working more closely to Fanaye.

4   Q   How would you characterize their working relationship?

5   A   It seemed good.

6   Q   Did you ever have any complaints regarding Fanaye from

7       Tom Grames?

8   A   I can't recall any, no.

9   Q   And did you ever have any complaints regarding

10      Tom Grames from anyone else?

11  A   Yes.

12  Q   From whom?

13  A   From Jeri.

14  Q   And what did Jeri complain about with regard to Tom

15      Grames?

16  A   She had some very explicit complaints, and that was at

17      the point where we had to make a decision as to

18      whether to extend him or not, and I think Jeri wrote a

19      very balanced e-mail, where she pointed out his

20      strengths but also pointed out his weaknesses.

21  Q   I'm not sure that I've seen that e-mail.  We have

22      looked for that.

23          What were the strengths that you can recall?

24  A   I think generally good job performance were the

25      strengths.

Buddy Ratner                                              October 30, 2006

Page 194

1   Q   And what were his weaknesses?

2   A   Weaknesses were a -- consistent problems with getting

3       along well with others, let's put it that way.

4   Q   With whom?

5   A   With other members of the staff.

6   Q   Do you know of any that he had any problems with?

7   A   There was somebody working, a young lady working the

8       front desk in the office.  She had a problem -- I

9       don't remember her name, but we had a number of people

10      that -- sort of a temp job that went through that

11      front desk.  There was an issue there.  There was an

12      issue with my personal assistant, who at the time was

13      *Jean Sprague.  And I think there was an issue with

14      some of the people in the communications group.

15          So there were a number of issues there that led

16      to staff frictions.

17  Q   Was Mr. Grames ever counseled on those?

18  A   Jeri wrote that she thought very hard about counseling

19      this individual and realized how difficult this would

20      be.  He was hired as a temp, and our situation was we

21      have no responsibility for temps.  We can hire them

22      and let them go as needed.  So unless we made a

23      decision to keep Tom Grames on, it would not have been

24      efficient to attempt to counsel on these rather

25      difficult issues.

Buddy Ratner                                    October 30, 2006

Page 195

1              MS. BRENNEKE:  106.

2              (Off-the-record discussion.)

3              (Exhibit-106 marked.)

4              MS. BRENNEKE:  Sorry, Mike.

5    Q   (By Ms. Brenneke)  Have you seen Exhibit-106 before?

6              MR. MADDEN:  "Sorry" means you don't

7    have a copy for me?

8              MS. BRENNEKE:  I don't.  I'm looking

9    for it, and I somehow disconnected or I don't have it.

10   But I'll make one for you, if you don't mind looking

11   on.

12             MR. MADDEN:  Well, since it's a

13   video deposition I can't very well look over his

14   shoulder.

15             MS. BRENNEKE:  That's a good point.

16   Hang on a second.  You can take a look at mine.

17   Q   (By Ms. Brenneke)  Do you recall Ms. Turner requesting

18   that Mr. Grames' appointment be continued?

19   A   Yes, yes.

20             MS. BRENNEKE:  That can be yours.  I

21   just found it.

22   Q   (By Ms. Brenneke)  And as of October 2nd, Ms.

23   Staley-Earnst indicated (Reading):  I have already

24   extended Tom's time for two weeks and asked for a

25   review of replacement candidates to occur

Buddy Ratner                                    October 30, 2006

Page 196

1      concurrently.

2              Do you see that?

3  A    Yes.

4  Q    So she wanted to replace him as of October 2nd; is

5      that correct?

6  A    That's right.

7                          MS. BRENNEKE:  Exhibit-107.

8                          (Exhibit-107 marked.)

9  Q    (By Ms. Brenneke)  Did Mr. Grames meet with you and

10     ask you to have the program coordinator position

11     posted so he would no longer be a temp?

12  A   I believe he did meet with me.

13  Q   Okay.  And was this a follow-up e-mail he sent to you

14     with regard to that conversation?

15              Yes?

16  A   I'm reading it.  Yes.

17  Q   And so as of October 3rd, 2003, you -- did you agree

18     with him that you had heard nothing but positive

19     feedback about his work and you would be happy to have

20     him as a permanent employee in that position?

21  A   I wrote that memo -- or, excuse me.

22  Q   He wrote the memo.

23  A   He wrote the memo, but there was probably a reasonably

24     accurate -- so I had written after that another memo

25     to Jeri, and Jeri gave me her study remarks or study

42f94783-2847-428d-80f7-5cc776e73631

Buddy Ratner                                          October 30, 2006

Page 197

1    conclusion on this, and I followed her advice.

2  Q   And isn't it true that Ms. Fanaye Turner had also

3     asked for his position to be posted?

4  A   Yes, that's right.

5              MS. BRENNEKE:  Exhibit-108.

6              (Exhibit-108 marked.)

7  Q   (By Ms. Brenneke)  Okay.  Exhibit-108, is that another

8     request from Mr. Grames seeking the position to be

9     posted?

10 A   Yes.

11 Q   Okay.  And when Ms. Turner indicated that she thought

12    it should be posted, did she indicate to you that it

13    was contrary to the policy of the University of

14    Washington as well as state law to keep him in as a

15    temporary?

16 A   She might have indicated that, so we terminated him.

17 Q   After she raised the policy concern, you terminated

18    him?

19 A   We knew -- we had many internal discussions about the

20    number of hours maxing out.  Personnel people keep

21    track of that.

22 Q   And what -- why wouldn't your response have been to

23    simply post the position and allow him to fill it?

24 A   Because I got advice from Jeri Staley-Earnst that made

25    very good sense to me, and I followed her advice.

Buddy Ratner                                          October 30, 2006

Page 198

1                          (Off-the-record discussion.)

2                          (Exhibit-109 marked.)

3    Q    (By Ms. Brenneke)  Was this the -- did you receive

4         this correspondence from Ms. Turner indicating that

5         this is a permanent position that should not be filled

6         by a temp and her concern that Tom Grames was going to

7         leave and she really needed him to do the work at

8         UCIRO?

9    A    There were many different --

10   Q    I mean do the work at UWEB?

11   A    -- e-mails going back and forth at that time.

12   Q    And he was terminated after that?

13   A    He was terminated, I think, within the legal limit in

14        the University.  So there was no, to my knowledge,

15        violation of University personnel rules.

16   Q    Because he hadn't yet worked the full maximum time; is

17        that correct?

18   A    I presume that was the reason, yes.

19   Q    Okay.  So did you involve Ms. Turner in the decision

20        to terminate Tom Grames?

21   A    No, I did not.

22   Q    Why not?

23   A    Because she was not doing personnel, handling

24        personnel at that time.

25   Q    But she had an excellent working relationship with

Buddy Ratner                                    October 30, 2006

Page 199

1      Tom Grames, correct?

2  A   It was very nice, yes.

3  Q   And he was doing a good job for this -- for the

4      department, correct?

5  A   He was doing a good job, but we decided he was not the

6      sort of employee we wanted in the long term.

7  Q   That was Ms. Staley-Earnst who decided that?

8  A   Ms. Staley-Earnst and myself.  I made the decision.

9  Q   Can you -- can you give me a general summary of what

10     it was that had occurred with these staff members.

11     You had mentioned a flare-up or hot temper or

12     something to Ms. Turner --

13 A   Yes.

14 Q   -- but we don't know what that --

15 A   He made a number of comments to a number of people

16     that suggested that he was having trouble dealing with

17     the workplace, and we didn't think somebody at this

18     time that was having difficulties with our workplace

19     should really be part of it at that point.

20 Q   Okay.  And can you give me any more detail?

21 A   In fact, he even recommended himself that he go; I

22     wouldn't take a job here, something to that effect.

23 Q   And none of those issues had to do with Ms. Turner,

24     correct?

25 A   None had to do with Ms. Turner, totally none.

Buddy Ratner                                          October 30, 2006

1    Q    And somewhere it's documented in an e-mail what the

2         issues were; is that correct?

3    A    That's right.

4                   MS. BRENNEKE:    Okay.    I'd ask that

5         be produced to me.    Maybe you can help us identify it.

6         We haven't been able to find that.

7    Q    (By Ms. Brenneke)    After Ms. Turner's assistant Tom

8         Grames was terminated, there was some concern about

9         getting that position refilled again; isn't that

10        right?

11   A    I don't recall exactly what happened upon that

12        termination.

13   Q    Did Ms. Turner -- did Ms. Turner provide you with some

14        requests that someone be hired to take the place of

15        Mr. Grames?

16   A    I believe she consistently said we need somebody to

17        fill that role, yes.

18   Q    And did she eventually find someone?

19   A    I don't recall at the moment.    I have to be reminded.

20        I'm sure it's quite well available.    I just don't

21        recall.

22   Q    I think I'm going to skip to something else instead.

23                  After Ms. Turner filed her UCIRO complaint, did

24        you take any other actions with regard to her roles

25        and responsibilities that diminished her work as the