UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

_____
                                                     )
FANAYE TURNER,                          )
                                                     )          No. C05-1575RSL
                        Plaintiff,          )
            v.                                  )          MEMORANDUM OF DECISION
                                                     )
UNIVERSITY OF WASHINGTON and   )
BUDDY RATNER,                             )
                                                     )
                        Defendants.     )
_____)

## I.  INTRODUCTION

        This matter was heard by the Court in a bench trial commencing on October 22, 2007 and

concluding on November 6, 2007.  Plaintiff Fanaye Turner, an Ethiopian-born black woman,

was the director of Education and Outreach ("E&O") for the University of Washington

Engineered Biomaterials program ("UWEB") from 1997 to 2004.  UWEB, which is part of the

University of Washington's ("UW") Department of Bioengineering, is a federally funded

National Science Foundation ("NSF") Engineering Research Center ("ERC") examining whether

implanted biomaterials can be engineered to perform and heal in a manner similar to normal

human tissue.  The E&O program was a crucial component at UWEB, focusing on increasing

the participation of under-represented groups in science and scientific research.

        Plaintiff claims that defendant UW and defendant Buddy Ratner, the Director of UWEB

and a professor of chemical engineering and bioengineering at UW, discriminated against

MEMORANDUM OF DECISION

1   plaintiff based on her race and national origin, and later retaliated against her after she made

2   internal complaints of race and national origin discrimination in 2003.  Plaintiff also claims that

3   defendant Ratner retaliated against her for opposing unlawful sexual conduct.  The Court has

4   jurisdiction over this matter under 28 U.S.C. § 1331 based on plaintiff's federal claims pursuant

5   to 42 U.S.C. §§ 1981 and 1983, and supplemental jurisdiction over plaintiff's state law claims.

6        Fanaye Turner and Buddy Ratner should have been friends for life.  They shared a

7   commitment to science education, a hope to extend the joy of science professions to under-

8   served groups such as women and minorities and a zest for life away from UW that led to Ms.

9   Turner participating in Dr. Ratner's wedding ceremony.  Instead, they find themselves avoiding

10  each other's glances sitting in opposing tables in an employment discrimination civil trial in the

11  United States District Court for two weeks.  How did this close professional and social

12  relationship disintegrate over time?  That is the question the Court must answer in determining

13  whether plaintiff has met her burden of proof in this trial.

14       It is clear that in 1997 Fanaye Turner arrived at the UWEB program as a talented and

15  valued member of an extraordinary team of scientists, educators and staff people embarked on

16  an important project with tremendous value to the community.  It is also apparent that she

17  departed UW in 2004 as a depressed, shaken individual who was a shell of her former self.  This

18  trial is about what happened between her arrival and departure and what caused the serious

19  emotional and economic damages Fanaye Turner suffered as a result of leaving her job under

20  duress in 2004.  Was Fanaye Turner a victim of discrimination by a series of managers and

21  fellow employees who treated her unfairly because of her race or Ethiopian background?  Or

22  was her downfall a matter of her own making fueled by her bursts of anger at colleagues and an

23  inability to see that while her motives may always have been good, her behavior became

24  unbearable in the workplace?  That it was these actions of Fanaye Turner that led to the

25  employment actions she later complained about, not any bias or prejudice by the defendants?

26

MEMORANDUM OF DECISION              -2-

Whenever good and honest people report events with widely differing stories, the explanation may range from outright lies, to faulty perceptions and memories.  As Paul Simon observed in "The Boxer," "A man hears what he wants to hear and disregards the rest."  The Court has heard from several witnesses who personally experienced the angry and intimidating behavior of Fanaye Turner in the workplace.  Ms. Turner denies each and every one of these events to the extent that she believes she never exhibited anything more than frustration with others' failure to meet her high standards at work.  It is this failure to recognize how her behavior caused these problems that leads Fanaye Turner to surmise that only racism, stereotyping and discrimination can explain the negative reactions of the individuals and the institution.

Fanaye Turner's position as E&O Director at UW was her dream job.  However, as with any position in a large organization—especially one with blurred lines of authority such as UWEB which was part of both the School of Engineering and the School of Medicine with questions about which Dean was in charge of which problems and which HR person was responsible for which complaint—there were undeniably bureaucratic failures that Fanaye Turner perceived as intentional affronts to her personally.  These started with her first days on the job when she saw racial discrimination behind her inability to get heat and new furniture in her office.  To compound the organizational problems inherent in UWEB's unique position, Dr. Ratner, as with many brilliant research scientists, did not have comparable skills as an administrator.  He traveled extensively for his work and he expected his staff to work out problems without bringing them to his attention.  What Fanaye Turner eventually came to see as an orchestrated plot to prevent her from attending key meetings and to deny her authority in crucial areas of her program was often just the everyday machinations of a bureaucracy where things do not always run smoothly.

The Court has considered the evidence presented at trial, the exhibits admitted into evidence, and the arguments of counsel.  Being fully advised, the Court now makes the

MEMORANDUM OF DECISION                    -3-

following findings of fact and conclusions of law:

## II.  FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff presented the following claims for trial:[1]

1.  Race and national origin discrimination based on disparate treatment against both defendants under Washington's Law Against Discrimination ("WLAD"), RCW 49.60;

2.  Race and national origin discrimination based on a hostile work environment against both defendants under RCW 49.60;

3.  Retaliation because of plaintiff's internal complaints of race and national origin discrimination against both defendants under RCW 49.60;

4.  Retaliation for objecting to unwanted acts and behaviors because of sex against defendant Ratner under RCW chapter 49.60;

5.  Race and national origin discrimination, including disparate treatment and hostile work environment, and retaliation against defendant Ratner under 42 U.S.C. § 1981; and

6.  Race and national origin discrimination, including disparate treatment and hostile work environment, and retaliation against defendant Ratner under the Equal Protection Clause of the Fourteenth Amendment and 42 U.S.C. § 1983.

See Dkt. #73 (Amended Pretrial Order) at 1-2; Dkt. #63 (Plaintiff's Amended Trial Brief).  The Court turns first to plaintiff's state-law discrimination claims.

### A.     RCW chapter 49.60 claims

#### 1.      Disparate treatment

Under RCW 49.60.180, "It is an unfair practice for any employer: . . . (3) [t]o discriminate against any person in compensation or in other terms and conditions of employment because of . . . race . . . [or] national origin[.]"  In Washington, in order to prove disparate treatment based on race or national origin, plaintiff has the burden to show that plaintiff's race or national origin was a "substantial factor" in the adverse employment action.  See 6A

---

[1]  Notably, plaintiff did not assert a claim under Title VII of the Civil Rights Act of 1964.

Washington Pattern Jury Instructions: Civil 330.01 (Employment Discrimination–Disparate Treatment–Burden of Proof), at 307 (2005) ("WPI"); Hill v. BCTI Income Fund-I, 144 Wn.2d 172, 186 (2001) (holding that at trial "the trier of fact must . . . hear and evaluate the parties' dueling explanations for the adverse action and reasonably determine whether the plaintiff has carried his or her ultimate evidentiary burden.  That ultimate burden in cases brought under RCW 49.60.180 is to present evidence sufficient for the trier of fact to reasonably conclude that the alleged unlawfully discriminatory animus was more likely than not a substantial factor in the adverse employment action.") (emphasis in original); see also Dkt. #63 (Plaintiff's Amended Trial Brief) at 7 (citing WPI 330.01 and Hill as governing legal standard).  Because "direct, 'smoking gun' evidence of discriminatory animus is rare, since 'there will seldom be 'eyewitness' testimony as to the employer's mental processes,' and 'employers infrequently announce their bad motives orally or in writing,' . . . '[c]ircumstantial, indirect and inferential evidence will suffice to discharge the plaintiff's burden.'" Hill, 144 Wn.2d at 179-80 (quoting United States Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 716 (1983); deLisle v. FMC Corp., 57 Wn. App. 79, 83 (1990); and Sellsted v.  Wash. Mut. Sav. Bank, 69 Wn. App. 852, 860 (1993)) (internal citations omitted).

"Substantial factor" means a significant motivating factor in bringing about the employer's decision.  It does not mean that plaintiff's race and national origin was the only factor or the main factor in defendants' decisions regarding the adverse actions or that plaintiff would not have sustained the adverse action but for her race or national origin.  See WPI 330.01.01; Mackay v. Acorn Custom Cabinetry, Inc., 127 Wn.2d 302, 311 (1995).

"Because workplace discrimination is 'a matter of state concern . . . [that] threatens not only the rights and proper privileges of its inhabitants but menaces the institutions and foundations of a free democratic state,' RCW 49.60.010, the Legislature has mandated that WLAD provisions 'shall be construed liberally for the accomplishment of the purposes thereof.'"  Hill, 144 Wn.2d at 179 (alterations in original) (quoting RCW 49.60.020).

MEMORANDUM OF DECISION                    -5-

Plaintiff presented evidence of numerous events that she contends constitute adverse employment actions, including:

(a)  removal of job authority and responsibilities including oversight of the E&O budget and supervision over the E&O staff and the program coordinator position;

(b)  exclusion from participation in meetings, presentations, and communications;

(c)  unwarranted and disproportionate discipline;

(d)  lack of salary increases and meaningful performance evaluations;

(e)  the failure to post the E&O coordinator position as a full time position; and

(f)  the refusal to take corrective action with respect to Caucasian, U.S.-born UWEB employees.

The Court assumes, without deciding, that these adverse employment actions are covered by RCW chapter 49.60 as affecting the "terms and conditions" of plaintiff's employment.  The Court finds, however, that plaintiff failed to prove by a preponderance of the evidence that plaintiff's race and national origin was a substantial motivating factor in the claimed adverse actions.  The Court finds that defendants' explanation that its actions were motivated by plaintiff's unprofessional, abrasive, and brusque management style is not only worthy of credence, but the evidence showed that defendants' actions affecting plaintiff's terms and conditions of employment were motivated predominately by plaintiff's unprofessional behavior and accompanying performance problems.  Contrary to arguments made by plaintiff at trial, the Court further finds that defendants' reaction to plaintiff's behavior was not in any way the product of stereotyping based on race or national origin.

In support of these findings, the Court highlights a few of the numerous events presented at trial demonstrating that plaintiff behaved in an unprofessional manner resulting in defendants' reasonable and nondiscriminatory or non-retaliatory actions.

As early as 1999, plaintiff exhibited unprofessional behavior at UWEB.  In September of 1999, Cyndi Long, an E&O coordinator supervised by plaintiff, ultimately left UWEB because

MEMORANDUM OF DECISION                    -6-

of adverse interactions with plaintiff.  Before Ms. Long's departure, plaintiff asked Ruth Johnston, a UW employee with a doctorate in organizational development and known within the UW community as someone willing to help resolve interpersonal conflicts, to report on the cause of the difficulties between Ms. Long and plaintiff.  See Ex. 88.  As part of this report, Dr. Johnston commented generally on the UWEB staff's general impression of plaintiff, stating that "[Plaintiff] is . . . seen generally as difficult to work with.  She is perceived to be condescending, directive, demanding and picky, and unwilling to share credit with others.  She is seen as working particularly well with those senior to her and particularly poorly with those junior to her.  Some have talked with her about their issues with her, and others are fearful to do so.  Staff sometimes avoid her or accommodate immediately to her needs in order to keep surface harmony."  Id.

By April 2002, the Court finds that plaintiff's unprofessional, confrontational behavior elevated to aggressive conduct during a meeting with Kahreen Tebeau, an African-American UWEB E&O program coordinator under plaintiff's supervision.  At trial, Caren Tidwell and Sheri Ireton credibly testified that Ms. Tebeau stepped out of her meeting with plaintiff with disheveled clothing exclaiming that plaintiff had just physically grabbed Ms. Tebeau to keep her from leaving the meeting.  Although plaintiff and Ms. Tebeau were the only people present in the room during this meeting, the Court finds that the version of this event reported by Ms. Tebeau to others more credible than plaintiff's story based on the factors identified in 9th Circuit Jury Instruction 1.11.  The Court finds that given Ms. Tebeau's circumstance and position at UWEB, there was no reason for her to distort the truth of her interaction with plaintiff.  Plaintiff is clearly minimizing the encounter and its impact on Ms. Tebeau.

Later, Nina Hanlon, Ms. Tebeau's replacement as E&O program coordinator, was involved in an incident in March of 2003 with plaintiff while working on the NSF annual report.  During a meeting with plaintiff, Ms. Hanlon was frightened by plaintiff's aggressive finger-pointing "bullying" behavior.  On cross examination, Ms. Hanlon testified that plaintiff's

MEMORANDUM OF DECISION                    -7-

emotional control at this meeting was not appropriate.  As a result of her negative interactions

with plaintiff, Ms. Hanlon requested to be reassigned out of UWEB.

In April of 2003, Lorease Kendrick, a UW Senior Human Resources Consultant who is

also African-American, investigated the verbal complaint Ms. Hanlon lodged against plaintiff as

a result of the March 2003 incident.  See Ex. 741.  At some point in April, plaintiff called Ms.

Kendrick to ask whether she had found that the accusations against plaintiff were the product of

racial discrimination.  When plaintiff was informed by Ms. Kendrick that the findings did not

support discrimination, plaintiff became very angry that Ms. Kendrick could not "see" that the

complaint about the incident was the result of discrimination.  On cross examination Ms.

Kendrick credibly testified that she felt very uncomfortable and surprised by plaintiff's reaction

because Ms. Kendrick believed that they had previously enjoyed a cordial relationship at UW.

Also in 2003, Mike Keller was assigned the UW University Complaint Investigation and

Resolution Office ("UCIRO") investigator for plaintiff's discrimination and retaliation complaint

lodged with UCIRO in April 2003.  In November of 2003, Mr. Keller met with plaintiff, in part,

to provide plaintiff with his preliminary findings.  After delivering information to plaintiff that

she found unfavorable to her claim, as reported in Mr. Keller's contemporaneous notes from the

meeting, plaintiff became aggressive and offensive toward Mr. Keller.  See Ex. 690 (at

UW_TUR10138) (observing that plaintiff "became aggressive and offensive" and told Mr.

Keller that he was "incompetent").  Mr. Keller credibly testified that at this meeting plaintiff

insulted him, clenching her fist, and that Mr. Keller informed plaintiff that the very type of

aggressive behavior that she was exhibiting in the meeting with him was the reason why others

reacted negatively to her.

The Court finds that plaintiff's bouts of unprofessional behavior and accompanying

performance problems, as demonstrated by these events and others presented at trial, were the

reasons for defendants' actions affecting plaintiff's terms and conditions of employment at

UWEB.  The Court also finds that plaintiff was not subjected to disparate discipline by

MEMORANDUM OF DECISION                    -8-

defendants.  As evidence of disparate discipline, plaintiff contends that five individuals received less severe discipline than plaintiff received, including:  (1) Alma Weightman; (2) Jeff Bonodio; (3) Judy Peterson; (4) Shari Ireton; and (5) Victoria Clarkson.  As explained below, however, plaintiff did not prove disparate discipline with respect to these individuals.

The Court first finds that Alma Weightman's treatment was not disparate given that there was no recurrence of Ms. Weightman's behavior after defendant Ratner requested an apology for the incident involving Ms. Weightman where she called plaintiff "a bitch."  In contrast, plaintiff's unprofessional behavior continued long after the incident with Ms. Weightman.  Second, Jeff Bonodio was a faculty member subject to a different set of disciplinary policies than plaintiff, and was not supervised by either defendant Ratner or Rita Jensen.  Therefore, even if Mr. Bonodio's discipline was disparate, which the Court does not find, a disparate treatment claim based on the level of discipline imposed on Mr. Bonodio is not actionable in this case because plaintiff's position as a professional staff employee is not comparable to a UW faculty position.  Third, the Court finds that Judy Peterson was not disciplined differently than plaintiff.  As with the incident between plaintiff and Ms. Weightman, defendant Ratner counseled Ms. Peterson and she was actually disciplined to a greater extent than plaintiff because Ms. Peterson was asked by defendant Ratner to leave UWEB.  Fourth, plaintiff's contention that Sheri Ireton was disciplined less severely than plaintiff for comments Ms. Ireton made regarding the gender of her baby fails for lack of credible evidence.  Finally, plaintiff failed to show that Ms. Clarkson, who was not a member of the UWEB staff, was subject to the same disciplinary standards as plaintiff.  And, unlike plaintiff's continuing unprofessional behavior during her tenure at UWEB, there is no evidence that incidents with Ms. Clarkson continued after consultation with Ms. Jensen.

On the findings set forth above, the Court concludes that plaintiff has not met her burden to show disparate treatment based on race or national origin.

MEMORANDUM OF DECISION                    -9-

**2.        Hostile Work Environment**

In Washington, to establish plaintiff's hostile work environment or harassment claim on the basis of national origin or race, plaintiff has the burden of proving:  (1) that there was language or conduct concerning national origin or of a racial nature, or that language or conduct occurred because of plaintiff's national origin or race; (2) that this language or conduct was unwelcome in the sense that plaintiff regarded the conduct as undesirable and offensive, and did not solicit or incite it; (3) that this conduct or language was so offensive or pervasive that it altered the conditions of plaintiff's employment; and (4) either: (a) that a manager of employer participated in the conduct or language; or (b) management knew, through complaints or other circumstances, of this conduct or language, and the employer failed to take reasonably prompt and adequate corrective action reasonably designed to end it; or (c) that management should have known of this harassment, because it was so pervasive or through other circumstances, and the employer failed to take reasonably prompt and adequate corrective action reasonably designed to end it.  See WPI 330.23; Glasgow v. Georgia-Pacific Corp., 103 Wn.2d 401, 406-07 (1985); Washington v. Boeing Co., 105 Wn. App. 1, 12-13 (2000).

At trial, plaintiff asserted that there were three overt comments regarding plaintiff's race or national origin.  First, plaintiff contends that defendant Ratner made an overt comment about plaintiff's Ethiopian heritage when considering hiring Dr. Tekie Mehary, who reportedly is from Eritrea.  Second, plaintiff claims that a comment was made about plaintiff being a "token." Finally, plaintiff claims that Julie Schmidt, a UWEB program coordinator, said "are you ethnic or something" when meeting plaintiff.  Despite these assertions, the Court finds that plaintiff did not present credible evidence to support these allegations.  Regarding the alleged comment made by defendant Ratner, there is nothing about the comment that the Court views as offensive. Plaintiff conceded in her deposition and at trial that defendant Ratner did not make any discriminatory comments based on plaintiff's race or national origin.  See Dkt. #77 (Turner Dep.) at 85:14-22 ("Q.  Did Dr. Ratner, during any time that you were employed at UWEB,

MEMORANDUM OF DECISION                    -10-

make any statements that you took as an indication that he was biased against people of African heritage?  A.  Never, no.  Not to the best of my recollection, he did not.  Q.  Did you believe that Dr. Ratner acted out of bias against you because of your African background.  A.  No, he did not.").  Next, the Court finds that based on plaintiff's own testimony at trial, the comment that plaintiff was a "token" was not made in relation to plaintiff's race or national origin.  The comment was made in reference to the fact that plaintiff was the only person in the department who did not like chocolate, prompting the comment at issue that plaintiff was the "token non-chocolate eater."  Finally, regarding the comment allegedly made by Ms. Schmidt, the Court finds that there is nothing discriminatory about the question (it is a version of the all too common question, "What nationality are you?").  Plaintiff also failed to show that management knew or should have known about this comment or its alleged offending impact on plaintiff.

Additionally, the Court finds that plaintiff has not proven her hostile work environment claim because she has not shown that these three "overt comments" coupled with all her other contentions about being stereotyped, represent conduct or language that was so offensive or pervasive that it altered the terms and conditions of plaintiff's employment.  Accordingly, based on the findings set forth above, the Court concludes that plaintiff has not met her burden to show a hostile work environment based on race or national origin.

### 3.  Retaliation

Under RCW 49.60.210(1), "It is an unfair practice for any employer . . . or other person to discharge, expel, or otherwise discriminate against any person because he or she has opposed any practices forbidden by [RCW 49.60], or because he or she has filed a charge, testified, or assisted in any proceeding under this chapter."  To establish a claim of unlawful retaliation by defendants, plaintiff has the burden of proving that plaintiff was opposing what she reasonably believed to be discrimination based on race or national origin or was participating in a proceeding to determine whether discrimination or retaliation had occurred, and that a substantial factor in defendants' adverse employment actions was plaintiff's opposition to what

she reasonably believed to be discrimination or retaliation, or participation in a proceeding to determine whether discrimination or retaliation had occurred.  See WPI 330.05; Allison v. Housing Auth. of Seattle, 118 Wn.2d 79, 96 (1991).  Plaintiff makes two distinct claims of retaliation.  The first claim is against both defendants for retaliation because of plaintiff's internal complaints concerning race and national origin discrimination.  The second claim is against defendant Ratner for retaliation because plaintiff objected to alleged unwanted acts and behaviors because of sex.  See Dkt. #63 (Plaintiff's Amended Trial Brief) at 20.  The Court discusses its findings with respect to these two claims separately, below.

### a.    Retaliation based on race and national origin internal complaints

Plaintiff claims, and the Court finds, that plaintiff engaged in protected activity when she opposed what she reasonably believed to be discrimination and retaliation in March through April of 2003, culminating with her UCIRO complaint in April of 2003 and retaliation complaint in October 2003.  See, e.g., Exs. 103, 150, 153, 65; Graves v. Dep't of Game, 76 Wn. App. 705, 712 (1994) ("[A]n employee who opposes employment practices reasonably believed to be discriminatory is protected by the 'opposition clause' whether or not the practice is actually discriminatory.") (citation omitted).  Plaintiff asserted that after engaging in these protected activities, she suffered adverse employment actions, including:

(a)  defendant Ratner's withdrawal of support coupled with negative and demeaning behavior toward plaintiff; a negative verbal performance approval; removal of job responsibilities, including supervision over the E&O program coordinator position and the Youth Take Heart ("YTH") support person, and E&O budget authority; exclusion from essential UWEB business; verbal reprimands; exclusion from NSF diversity grant writing; the delay in hiring a YTH support person; exclusion from presenting at an all UWEB meeting in May 2004; and no 2004 performance evaluation; see Exs. 56, 62;

(b)  removal of NSF grant files from plaintiff's office; see Ex. 166;

(c)  efforts by others, including Ms. Staley-Earnst and Ms. Tidwell to "dig up dirt" on

MEMORANDUM OF DECISION                    -12-

1   plaintiff and portray her in a negative light; <u>see, e.g.</u>, Exs. 164, 105, 180, 184, 511;

2          (d)  a negative written 2003 performance evaluation without the opportunity for rebuttal;

3   <u>see</u> Ex. 98;

4          (e)  lack of salary increases in 2003 - 2004;

5          (f)  exclusion from the NSF Administrative Consultancy Meeting; <u>see</u> Ex. 110;

6          (g) refusal to post the E&O program coordinator position so that Tom Grames, the

7   temporary coordinator, could apply; and the subsequent termination of Mr. Grames; and

8          (h) the failure to investigate the October 30, 2003 letter regarding retaliatory acts; <u>see</u> Ex.

9   65.

10          The Court finds, however, that plaintiff failed to prove that plaintiff's opposition to what

11   she reasonably believed to be discrimination based on race or national origin, or participation in

12   the UCIRO proceeding, was a substantial motivating factor in the adverse employment actions

13   described above.  The Court finds more credible defendants' explanation that the actions were

14   motivated by plaintiff's unprofessional, abrasive, and brusque management style and plaintiff's

15   performance problems in 2003 and 2004.  These management style and performance problems in

16   2003 and 2004 included adverse issues with the YTH grant, and the failure to timely complete

17   the E&O parts of the 2003 and 2004 NSF annual reports.  <u>See</u> Exs. 217; 218; 478; 709.  In

18   particular, the Court finds that defendant Ratner credibly testified that his attitude toward

19   plaintiff changed not because of plaintiff's opposition to race or national origin discrimination,

20   but because his superior, Engineering School Dean Denise Denton gave him an "order" that she

21   did not want to have to intervene in any future personnel issues at UWEB caused by plaintiff's

22   actions.

23          Based on these findings, the Court concludes that plaintiff has not met her burden to

24   show retaliation because of plaintiff's internal complaints, including the complaints filed with

25   UCIRO, concerning plaintiff's race and national origin discrimination.

26

MEMORANDUM OF DECISION              -13-

b.        **Retaliation based on objection to unwanted sexual conduct**

Plaintiff claims that defendant Ratner retaliated against her because she rejected Dr. Ratner's sexual advances.  Plaintiff's allegations concerning unwanted sexual conduct, however, did not come to light until plaintiff's counsel sent UW a claim letter in July of 2004.  See Ex. 12. These allegations are founded on plaintiff's version of events involving her interactions with Dr. Ratner.  The Court finds, however, that plaintiff's testimony regarding Dr. Ratner's alleged advances is simply not credible based on the factors identified in 9th Circuit Jury Instruction 1.11 and Dr. Ratner's denial is credible under the same factors.  Based on these findings, the Court concludes that plaintiff has not met her burden to show retaliation against defendant Ratner for objecting to unwanted sexual conduct.

**B.    Federal Claims**

**1.       42 U.S.C. § 1981 claim against defendant Ratner**

42 U.S.C. § 1981 prohibits discrimination in employment based on race, which includes discrimination based on "immigrant ethnic groups."  Fonesca v. Sysco Food Servs. of Ariz., Inc., 374 F.3d 840, 850 (9th Cir. 2004) (holding that while "national origin is not within the ambit of § 1981," race is defined broadly to cover "immigrant ethnic groups").  Section 1981 can be violated only by intentional discrimination.  General Building Contractors Ass'n, Inc. v. Pennsylvania, 458 U.S. 375, 391 (1982).  Section 1981 also prohibits retaliation claims.  Manatt v. Bank of Am., NA, 339 F.3d 792, 800-01 (9th Cir. 2003).

Based on the findings set forth above, the Court concludes that plaintiff failed to prove that defendant Ratner, or his subordinates, intentionally discriminated against her in any way because of her race, or retaliated against her.

**2.       Equal Protection and 42 U.S.C. § 1983 claim against defendant Ratner**

Claims based on the Equal Protection Clause under 42 U.S.C. § 1983 are co-extensive with claims based on 42 U.S.C. § 1981.  See Grutter v. Bollinger, 539 U.S. 306, 343 (2003) (citing General Building Contractors Ass'n, Inc. v. Pennsylvania, 458 U.S. 375, 389-91 (1982)

1   (the prohibition against discrimination in § 1981 is co-extensive with the Equal Protection

2   Clause); Assoc. General Contractors of Cal. v. Coalition for Econ. Equality, 950 F.2d 1401,

3   1412 n.8 (9th Cir. 1991) ("The rights protected by section 1983 are coextensive with the equal

4   protection clause's guarantee against racial discrimination."); Peters v. Lieuallen, 746 F.2d 1390,

5   1393 (9th Cir. 1984) ("Since Peters has failed to demonstrate intentional discrimination on the

6   part of the defendants, his race discrimination claims under 42 U.S.C. §§ 1981 and 1983 must

7   also fail.").

8        Based on the Court's findings above that defendant Ratner, or his subordinates, did not

9   intentionally discriminate against plaintiff based on her race or national origin, or retaliate

10  against her, the Court concludes that plaintiff has not met her burden to prevail on her § 1983

11  and Equal Protection Clause claim.

12                              **III.  CONCLUSION**

13       This was not an easy case for the Court to decide.  Fanaye Turner is a likeable woman

14  who brings an admirable passion to all her endeavors.  Throughout the course of her

15  employment at UWEB, however, plaintiff failed to accept that her colleagues' perception of her

16  was not the product of race, national origin, sex discrimination, stereotyping, or retaliation, but

17  rather was a reasonable reaction to her brusque and abrasive management style.  As plaintiff's

18  mentor Dr. Johnston reported in November of 1999, "Fanaye does not perceive herself in the

19  way that others do[.]"  Unfortunately, plaintiff failed to internalize and improve her

20  unprofessional behavior even after the November 1999 report commented that plaintiff was

21  "seen generally as difficult to work with . . . condescending, directive, demanding and picky,

22  and unwilling to share credit with others."  Notably, these problems were identified in 1999 well

23  before plaintiff engaged in protected activities in 2003 and 2004 by opposing what she

24  contended was discrimination and retaliation.  Although defendants' response to plaintiff's

25  behavior may not have been artful, defendants' actions were not the product of discrimination or

26  retaliation.  Defendants never terminated plaintiff's employment with UWEB even though they

MEMORANDUM OF DECISION                    -15-

arguably had a legitimate basis to do so after the incident with Ms. Tebeau in April of 2002. Because plaintiff was instrumental in developing the highly successful E&O program at UWEB and was considered an essential part of the UWEB team, defendant Ratner and others at UW, including the former Dean of the Engineering School, attempted for years to devise a way to structure plaintiff's responsibilities and supervisory roles to ameliorate her behavioral episodes. Unfortunately, plaintiff was unwilling to accept these reasonable accommodations because she incorrectly perceived them as discriminatory or retaliatory.  At trial, however, plaintiff did not prove that defendants were motivated in any way by plaintiff's race, national origin, sex, or retaliated against her because she made internal complaints.

Ms. Turner's life story is a compelling one.  The Court will never forget her testimony about her love of her native country's star-filled sky or how much her mother's confidence that she would be the first one in her family to be a college graduate inspired her to achieve great things.  Her joy at dancing again at her daughter's wedding shows that Ms. Turner is capable of experiencing joy again.  As Ms. Turner's able counsel pointed out in closing argument, the process of coming forward and telling your story can help a person repair the damage caused by negative events.  While the Court has not found that plaintiff proved her legal claims against the defendants, there is no denying that Ms. Turner clearly had a profoundly positive effect on the lives of young women such as Mariana Loya, who credited much of her success to Ms. Turner. And of course her daughter, Dr. Diana Turner, is such an impressive woman who attributes much of her success to the support and encouragement she received from her mother.

Her co-workers, Janet Blanford and Amy Leslie described Ms. Turner as incredibly outgoing, a visionary thinker and an inspiration.  For individuals who could handle Ms. Turner's blunt and direct style, she was a joy to work with.  But she could not see that for other individuals, she needed to use a more diplomatic style and when she crossed the line into bullying and abusive behavior, she had an extremely negative influence on the workplace.

MEMORANDUM OF DECISION                    -16-

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

For all of the foregoing reasons, and based on the findings recited above and the Court's conclusions of law, the Court finds in favor of defendants on all of plaintiff's claims.  The Clerk of Court is directed to enter judgment in favor of defendants and against plaintiff.

DATED this 11th day of December, 2007.

Robert S. Lasnik
United States District Judge

MEMORANDUM OF DECISION                    -17-